**UNITED MINE WORKERS OF AMER-ICA, Appellant,**

v.

**MEADOW CREEK COAL COMPANY, Inc., Appellee.**

**No. 13470.**

United States Court of Appeals
Sixth Circuit.

Jan. 21, 1959.

---

E. H. Rayson and R. R. Kramer, of Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn. (William J. Turnblazer, Middlesboro, Ky., Willard P. Owens, Washington, D. C., on the brief), for appellant.

Lewis S. Pope, Nashville, Tenn., for appellee.

Before MARTIN and MILLER, Circuit Judges, and JONES, District Judge.

MARTIN, Circuit Judge.

United Mine Workers of America (an unincorporated labor union or association) has appealed from a judgment against it in favor of Meadow Creek Coal Company, Inc. (a Tennessee corporation), entered by the United States District Court for the Middle District of

Tennessee after a lengthy trial without the intervention of a jury. The award consisted of $300,000 compensatory damages and $100,000 punitive damages.

The district court rested its jurisdiction upon the pleadings and upon the entire evidence, for the reason that the coal company's claim of a secondary boycott as proscribed under section 187 of Title 29 U.S.C.A. [Labor Management Relations Act], presents a federal question. The judgment of the court was based upon forty-one separate findings of fact—all supported by substantial evidence and not clearly erroneous—and upon its conclusions of law. We shall undertake first to recite in narrative form the fact findings of the district court and then discuss its conclusions of law in the light of the main points made by the appellant.

The United Mine Workers of America, composed of a membership of over 300,000 with headquarters in Washington, D. C., has district and local offices throughout the United States and in Canada. It functions under a written constitution, providing for a president, a vice-president, and a secretary-treasurer. Its affairs are under the control of these officers and an international board whose members are elected from various districts in the United States. The international union collects monthly dues from its members at the rate of $4.25 each, remitted to the Washington office. Of this amount, $2.25 per member, per month, is retained at the international headquarters in Washington and $2.00 of each member's dues each month is returned to the district from which the collection is made, to be divided between the districts and the local unions.

The international union has virtually all the rights and powers vested in corporations, including among others the right to sue and be sued in its own name, the right to adopt by-laws, to appoint representatives, agents and other employees, and the right to own and maintain property. The individual members are not liable individually for the debts and obligations of the organization, which, on January 1, 1957, possessed nearly $21,000,000 in cash and bonds.

The appellee coal company, organized in 1935, was actively engaged in mining and marketing coal in Putnam County, Tennessee. In 1944, at the instance of representatives of appellant, a consent election under supervision of the National Labor Relations Board was held, with the result that only one-third of the employees of the appellee company cast votes in favor of appellant as bargaining agent.

In the latter part of 1946, appellant sent into Putnam County, Tennessee, four organizers to campaign for the organization of all mines in that vicinity which did not have bargaining agreements with the international union. They were successful in organizing workers in several mines and passed much time in and around Monterey, Tennessee, which was located only two miles from the mine of the appellee company. They stayed there for the purpose of organizing Meadow Creek's employees, but failed to interest a majority of them.

As found by the district court, appellant determined in the latter part of December, 1947, to close down the appellee's mine by force; and, through its representatives in the area and with the aid of many of its members in that region of Tennessee and Kentucky, conspired to go in force upon the property of the appellee. In furtherance of this conspiracy, some 200 members of the United Mine Workers of America met on the morning of January 12, 1948, at Sparta, Tennessee, which is located about 22 miles from the mine of appellee. They formed a motorcade to the Meadow Creek Mine and arrived there in a body around 2:30 in the afternoon. The night and day shifts were changing. The mob blockaded appellee's private road and stationed guards between the intersection of that road with the public highway and the mine. No customers were allowed to enter the property of appellee. The mob, some of whom were armed, intercepted employees of the appellee company and, by persuasion and threats of bodily harm to them and their families if they did

not do so, urged them to join the United Mine Workers of America.

Prior to this assembly there had been no labor trouble at appellee's mine. Including both night and day shifts, appellee had 169 employees on January 12, 1948—the date the mob gathered at the mine. A truck was backed up in front of the commissary and the mob crowded around it. From the bed of the truck, J. W. Ridings, a member of appellant's international board and the leader of the invasion; Hugh Brown, one of appellant's representatives; and Howard Madewell, President of the United Mine Workers Union at Wilder, Tennessee, addressed the assembly, including the mine workers. These speakers boldly asserted that appellee's mine would not be run another day unless the company signed a contract with the union.

When they arrived at the mine, Madewell (President of Local at Wilder) and Stultz (representative of appellant's District 19,) who were in the first of approximately seventy-five cars constituting the motorcade, told Powell (a supervisory employee of appellee) that they had come to shut down the mine and that it would stay closed until the company signed a contract with the union. The district court found that such was the obvious purpose of appellant in organizing and directing the march on the mine of appellee.

In consequence of the mob's action, the night-shift workers would not enter the mine that night and, on the following day, only eight or ten men reported for work. This was too small a force for operation of the mine; and, although the mine was kept in operable condition by the use of supervisory employees, the company was unable to recruit sufficient workers for the resumption of mining.

Only three days before the unlawful march on the mine, Ridings and Brown had called upon appellee's president (W. T. Ray) at his home. They told him that the United Mine Workers of America represented a majority of his employees and that they wanted to talk with him about a collective bargaining agreement. But they did not in fact represent the majority of the employees at that time and they presented no proposed contract. Nevertheless, President Ray told them that if appellee's employees wanted the United Mine Workers of America to represent them, he would be glad to discuss the matter with union representatives at any time. This was the only meeting, either requested or held, between the representatives of the union and the management of the company before the march on the mine on January 12, 1948. Appellee was given no advance notice of this *tour de force*.

On the day following (January 13, 1948), the leader, Ridings (member of the international board of appellant) left Tennessee and did not return for two weeks. President Ray—even though his life had been threatened—stayed at the mine until January 31 when he went to Florida, as was his custom, and remained there for about six weeks. The union was furnished his Florida address, but none of the representatives communicated with him. Upon his return to Monterey on March 12, 1948, no effort was made to arrange a meeting with him, although Ridings knew that he was in Monterey. President Ray went back to Florida and remained there for two weeks before coming back to Tennessee.

On account of the apparent animosity of the appellant toward appellee's president, the appellee company decided to organize a new company to operate the mine and deliver the coal to appellee, in railroad cars or trucks, at the mouth of the mine. To consummate this, a corporation known as the "Tennessee Coal Company" was organized under the laws of Tennessee. This new company entered into a contract with Meadow Creek Coal Company under the terms of which the new corporation would use the equipment of appellee to mine the coal and deliver it to appellee, as planned. Appellee contracted to pay the Tennessee Coal Company the actual cost of mining the coal, plus ten cents per ton.

It was agreed that the coal, both in the ground and at all times, belonged to ap-

pellee; and that the Tennessee Coal Company had only the right to mine and produce it. Appellee sold the coal and received all proceeds from sales. This plan of operation was adopted in an effort to reduce the damage suffered by appellee as the result of its mine being closed. Appellee rendered aid to the Tennessee Coal Company in its mining and production operation and paid salaries to some of its administrative officers and employees.

At the time Meadow Creek's mine was first opened for production, appellee had no railroad to the mine and was limited to truck sales and deliveries in the movement of its coal. This situation continued until a railroad was built to the mine some two years prior to the events of January 12, 1948. Of necessity, appellee had built up a very unusual truck trade for the movement and distribution of its product, a large portion of which was sold and transported by truck even after the railroad to the mine had been completed. Indeed, on January 12, 1948, appellee had more than 500 truck customers scattered over a wide area of Tennessee and Kentucky. There were more than a hundred trucks at the mine on the critical date. Some of those that went to the mine for coal on that date (January 12) were forced to return empty because they were prevented by the assembled mob from entering upon appellee's property.

The district court found that trucks approaching the mine for coal were met on the private road, blocked by union representatives, some of whom were armed with guns; and the truck drivers were told by the members of the United Mine Workers of America to "get the hell out of there" and not to come back until the management of the company had signed a contract. One truck was being loaded with coal at the bin when the mob arrived. Some of the mobsters climbed upon the running board of the truck and told the driver that his would be the last load of coal to leave the mine until a union contract was signed by the management.

Stultz, heretofore identified, went to a coal dealer in Crossville, Tennessee, who had been hauling coal from the mine in two trucks prior to January 12, and threatened to blow up his place of business if he even sold the coal which had come from the mine of appellee. The district court found that the drivers or owners of 500 or more trucks, used in doing business with appellee, had been placed in such fear of bodily harm that they did not return to the mine for coal until a contract had been signed by the management with the union in July of 1948.

Another consequential incident was related by the district court in its findings: On June 23, 1948, a portion of the railroad track running from the main line of the Tennessee Central Railroad to appellee's mine was destroyed by a dynamite explosion. This act placed employees of the railroad in fear of great bodily harm and caused them to refuse to transport coal from the mine. The evidence shows that, at a place near where the explosion occurred, certain members of the United Mine Workers of America had possessed, handled and transported dynamite on the same night on which the railroad tracks had been blown up.

While two members of the union charged with the dynamiting of the railroad were in jail at Cookeville, a representative of the United Mine Workers of America visited them on several occasions and brought them food and cigarettes. On the date of the execution of the contract between appellant and the Tennessee Coal Company, Ridings requested that company to drop the prosecution of the two union members charged with blowing up the tracks. The request was granted and no prosecution ensued. The district court found that it was reasonable to conclude from all the circumstances that the appellant was responsible for the dynamiting of the Tennessee Central's tracks.

Because of the foregoing acts and the conduct of appellant's members, employ-

ees of the railroad became fearful to the extent that they refused to place cars at appellee's mine. In consequence, the railroad company, itself, refused to furnish railroad cars at the mine, or to handle or transport any of appellee's coal, from the date of the dynamiting until July 14, 1948—the day following execution of the contract between the union and the Tennessee Coal Company.

Another relevant incident is narrated in the findings of fact of the district court. Members of the United Mine Workers of America had called a meeting of various locals in the area to convene at Monterey before daylight on the morning of July 2, 1948. The purpose of the meeting was to march again on the mine and force its closing. Numerous members of the local did assemble at Monterey; but they abandoned the planned march on the mine after learning that it was not open on that date. Nevertheless, fifteen or twenty members of the union who had attended the meeting intercepted three employees of the Tennessee Coal Company who were on their way to the mine, forced them to get out of their automobile, drew pistols on them, abused them and cursed them with vile epithets, called them "scabs" and told them that their days of operating the mine without a union were ended. They then instructed the employees to inform the other men working at the mine of what the employees had been told. These union members were led by Clemons, who had assisted in organizing (for appellant) the employees of other mines in the area. A few days later, Clemons was shot by a brother of one of the three men whom he had intercepted. Some two years later, Clemons wrote a letter to the president of appellant U. M. W. A. This letter was not introduced in evidence; but Clemons testified that, in the letter, he advised the union president of his organizing activities and of the occurrences leading to his being shot. He later received a check for $5,000, signed by appellant's president and delivered to him by Ridings—the central character in the union's activities in this case.

During the time between January 12, 1948, when the mine was closed, and July 13, 1948, when appellant and the management of the operating company entered into a contract, appellant arranged with numerous merchants in the area to supply groceries and other merchandise to former employees of the appellee who had refused to return to the mine for work. The cost to appellant amounted to more than $70,000, which the court found was supplied to appellee's employees to keep them from returning to work.

The district court found that, in closing appellee's mine and in keeping it closed by force and threats of bodily harm and acts of violence, and in conspiring with its members to accomplish the same purpose, appellant acted wilfully and wantonly and with intent to damage appellee's business.

Relative to the damage feature of the case, the district court found that the mining conditions in appellee's mine on January 12, 1948, were good, there being an unusual vein of coal averaging five and one-half feet in thickness; that working conditions in the mine were also good; that appellee had been developing the mine and increasing its output; and that on and sometime prior to January 12, 1948, the mine was producing more than 1000 tons of coal per working day, with good prospects for increasing output. It was found further that the appellee (during 1947) had mined and sold 217,179.77 tons of coal, about one-third of which had been transported by truck and the rest by railroad. Appellee's net profit on its business for the year 1947 had been $374,149.17.

Moreover, appellee had a new contract, effective January, 1948, and continuing through 1948 and longer, with the Tennessee Valley Authority for daily shipments of a large quantity of coal. This contract covered only the lowest price coal produced in the mine; and, under the contract, appellee was to receive $5.00 per ton, f. o. b. the mine. Just prior to January 12, 1948, trucked coal was selling at an average price of

$5.91 per ton at the mine, with a price increase through 1948, the average price of all trucked coal sold from the mine during that year being $7.55 per ton. In the nine days of operation between January 1 and January 12 of 1948, the net profit to appellee from the mine amounted to $30,109.71, making a yield of $3.13 per ton average.

In its final finding (No. 41), the district court said: "On the whole record and in the light of the entire evidence, the Court finds that the unlawful conduct of the defendant in closing plaintiff's mine by force of a large mob, by threats, by acts of violence and other wrongful means, directly caused the plaintiff to suffer damages to its business for the year 1948, principally for the first half of that year. Considering the volume of business and profits for the year 1947, the plaintiff's prospects for increased business and lower costs in 1948, the contracts which the plaintiff had, the general conditions which prevailed in the industry, and the entire record, the Court is of the opinion and finds that a fair amount to compensate the plaintiff for its loss on account of the unlawful conduct of the defendant is the sum of $300,000."

In addition to compensatory damages, the court awarded the appellee $100,000 punitive damages.

Together with its findings of fact, the district court promulgated conclusions of law. Before discussing these conclusions, we shall reply to the first two points made by the United Mine Workers of America on this appeal. These points relate to service of process.

■ First, appellant denies that service of process on a regional director of District 50, United Mine Workers of America, was valid service on an "agent" of the appellant labor union "in his capacity as such", within the meaning of section 301(d) of the Labor Management Relations Act of 1947 [29 U.S.C.A. § 185 (d)]. That argument has been rejected by this court in Claycraft Co. v. United Mine Workers of America, 6 Cir., 204 F. 2d 600. But, even if the Claycraft case could be distinguished in principle, which

we think it cannot be, we are of opinion that binding service of process upon appellant was made by service upon the Secretary of State of Tennessee, pursuant to section 8679.1 of the Supplement to Code of Tennessee of 1950, which provides that, where an unincorporated association or organization fails to appoint a process agent pursuant to the statute, process may be served upon the Secretary of State of Tennessee. See McDaniel v. Textile Workers Union of America, 36 Tenn.App. 236, 254 S.W.2d 1.

■ The next point on appeal urged strongly by appellant goes to the *jurisdiction* of the United States District Court. Appellant insists that, in this case in which jurisdiction of the district court was grounded upon section 303 of the Labor Management Relations Act of 1947 [29 U.S.C.A. § 187], the trial court, having in effect held that there was no violation of the federal Act, had no jurisdiction to determine and decide the common law or non-federal cause of action.

In its first four conclusions of law, the court held: "1. On the basis of the pleadings and the entire evidence, the plaintiff's claim of secondary boycott under 29 U.S.C.A., section 187, raises or presents a substantial federal question, and consequently the court has jurisdiction to adjudicate such claim. 2. The material and operative facts supporting the plaintiff's federal claim of secondary boycott are substantially the same as the facts supporting its nonfederal or state claim of an unlawful conspiracy to injure its business. 3. The claim of secondary boycott and unlawful conspiracy are not separate causes of action but are merely different grounds to support a single cause of action, the cause of action being the violation by the defendant of the plaintiff's right to be free from wrongful interference with its business. 4. By reason of Conclusions 1, 2 and 3, above, the Court has jurisdiction of the nonfederal claim of unlawful conspiracy to injure the plaintiff's business, under the doctrine of Hurn v. Oursler, 289 U.S. 238, [53 S.Ct. 586] 77 L.

Ed. 1148. See also American Fidelity and Casualty Co. v. Owensboro Milling Co., 6 Cir., 222 F.2d 109; Wertanen v. Welduction Corp., Dist. Court, Eastern District of Michigan, 151 F.Supp. 440." Cf. United Construction Workers, etc. v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025.

We are in accord with the conclusion of the district court on the question of jurisdiction. The scholarly opinion of Mr. Justice Sutherland in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, would appear to be determinative of the issue. There, a suit was filed in the United States District Court seeking redress for copyright infringement which raised a substantial federal question and sought to obtain relief, as well, upon the ground that identical acts constituting the alleged infringement were also unfair competition under the state law. It was held by the Supreme Court that the federal question raised by the pleadings gave the court jurisdiction; and that, although the federal claim was rejected on the merits, the district court still possessed jurisdiction to decide the claim of unfair competition on its merits. Siler v. Louisville & Nashville R. Co., 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753, was pointed out as having held that, where the trial court acquired jurisdiction by reason of the federal questions involved, the court "had the right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or even if it omitted to decide them at all, but decided the case on local or state questions only." Lincoln Gas & Electric Light Co. v. City of Lincoln, 250 U.S. 256, 39 S.Ct. 454, 63 L.Ed. 968, was also cited with the statement that there were many other cases where the rule had been stated and restated in substantially the same way. Numerous citations followed [289 U.S. 244, 53 S.Ct. 588, 589]. See also another opinion of Mr. Justice Sutherland in Baltimore Steamship Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L. Ed. 1069; and the opinion of this court in American Fidelity & Casualty Co. v.

Owensboro Milling Company, 6 Cir., 222 F.2d 109, cited supra.

In his conclusions of law in the case at bar, United States District Judge Miller cited also Wertanen v. Welduction Corp., 151 F.Supp. 440, in which District Judge Levin said: "According to Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 589, 77 L.Ed. 1148, when a case presents a substantial federal question the Court has jurisdiction to dispose of all grounds, either federal or state, which are 'in support of a single cause of action'."

Upon the facts found by the district court, as outlined at length in the early portion of this opinion, we think that this case presents only a single cause of action; that the claim of secondary boycott and unlawful conspiracy are not separate causes of action, but merely different grounds to support a single cause of action.

■ In its fifth conclusion, the trial judge stated that the acts and conduct of the defendant as set forth in the findings constituted unlawful interference with the plaintiff's business, in violation of the latter's rights under the common law of Tennessee; and that this entitled the plaintiff to recover damages proximately resulting from such interference. The court further asserted that the means employed by the defendant to accomplish its purpose were improper and unlawful. These means consisted of harassment, violence and threats of violence against the plaintiff, its employees, its customers and all persons doing business with the plaintiff. The effect of defendant's conduct was said to have interfered drastically with, and to have curtailed, production of coal at plaintiff's mine during 1948.

In its next conclusion, the district court held the defendant responsible for the acts and conduct of its agents, servants and representatives, in accordance with the general principles of the law of master and servant, or principal and agent. It was concluded that the defendant was shown clearly to have been directly responsible for the conduct which

brought about the wrongful closing of plaintiff's mine and the wrongful interference with its business to such extent as to place liability therefor upon the defendant association. We are in accord with these conclusions.

We think, as did the district judge, that the case falls within the principles of the authorities which he cited: Brumley v. Chattanooga Speedway & Motordrome Co., 138 Tenn. 534, 198 S.W. 775; Shell Oil Co. v. State Tire & Oil Co., 6 Cir., 126 F.2d 971; United Construction Workers, etc. v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; and United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, 47 A.L.R.2d 850. Substantially the same definition of civil conspiracy given in the Brumley case was stated by the Tennessee Supreme Court in McKee v. Hughes, 133 Tenn. 455, 459, 181 S.W. 930, 931, L.R.A.1916D, 391, where it was said: "A 'civil conspiracy' may be defined to be a combination between two or more persons to accomplish by concert of action an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means; the damage caused being the gist of any action."

A study of the opinion in the Laburnum case, supra, on account of its similarity in principle and in relevant facts, further demonstrates the correctness of the district court's conclusions. The comprehensive opinion of Judge Parker in United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, 47 A.L.R.2d 850, makes it clear that, in relation to a case of this character brought pursuant to the Taft-Hartley Act, it was undoubtedly the intention of Congress to apply the common law rule with respect to liability for the acts of an agent. The United States Court of Appeals held that, where a field representative of the international union was engaged in both its own business and that of the district union in carrying on organization work, both unions were responsible for acts done by the field representative within the scope and course of his employment.

Appellant contends urgently that the instant action, having been commenced more than three years from its accrual, is barred by the Tennessee three-year statute of limitations (section 28–305, Tennessee Code Annotated). The district court held that the cause of action in controversy is governed by the ten-year (section 28–310, Tennessee Code Annotated) and not the three-year statute of limitations and is, therefore, not barred. The three-year statute [Tennessee Code Annotated, 28–305] reads as follows: "Actions for injuries to personal or real property, actions for the detention or conversion of personal property, civil actions based upon the alleged violation of any federal or state statute creating monetary liability for personal services rendered, or liquidated damages or other recovery therefor, when no other time of limitation is fixed by the statute creating such liability, and actions for alienation of affections, shall be commenced within three (3) years from the accruing of the cause of action."

The ten-year statute [Tennessee Code Annotated, 28–310] reads thus: "Actions against guardians, executors, administrators, sheriffs, clerks, and other public officers on their bonds, actions on judgments and decrees of courts of record of this or any other state or government, and all other cases not expressly provided for, shall be commenced within ten (10) years after the cause of action accrued."

The district judge relied upon the authority of City of Atlanta v. Chattanooga Foundry & Pipe Works, 6 Cir., 127 F. 23, affirmed in Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241. It was stated that the decision of the Supreme Court of Tennessee in Sanford-Day Iron Works v. Interprise Foundry & Machine Co., 138 Tenn. 437, 198 S.W. 258, construes, not the Tennessee three-year statute of limitations, but a statute pertaining to the jurisdiction of the chancery court, and cannot be regarded as disapproving by implication the long-standing decision in

City of Atlanta v. Chattanooga Foundry & Pipe Works, supra.

The opinion in the City of Atlanta case was written by Judge Lurton, who had been Chief Justice of the Tennessee Supreme Court and was appointed from our court to the Supreme Court of the United States. The action was based upon the alleged violation of the Anti-Trust Law of the United States (Act of July 2, 1890, Ch. 647, 26 Stat. 210, 15 U.S.C.A. §§ 1–7, 15, note, providing that "any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States * * * and shall recover three fold the damages by him sustained." It was held that the action was not one for injury to property within the coverage of section 4470, Shannon's Tennessee Code, and was therefore not barred by the three-year statute and would be barred only by the ten-year statute of limitations.

Judge Lurton said: "That section [the three-year statute] plainly applies only to causes of action arising out of some injury to property, as distinguished from its detention or conversion. Property, either personal or real, may be injured or damaged without its being either detained or converted. But whether the cause of action be an injury or damage to the property, or for its taking or detention, the suit must be brought within the same period. This distinction between the two kinds of injury to tangible personal property is of very ancient origin * * *.

"We find in the very carefully selected verbiage of section 4470 a recognition of the two kinds of injury to which tangible property is susceptible—one by a damage which does not affect the possession, and the other by a taking or detention which does.

"While the precise question has not been decided by the Supreme Court of Tennessee, we do find an indisposition to give to the section any such broad and indeterminate meaning as would include a suit which does not involve any actual injury to property." [1274.30.]

On appeal, the Supreme Court of the United States affirmed the judgment of this court. Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 397 et seq., 27 S.Ct. 65, 67, 51 L.Ed. 241. It was pointed out that "there is a sufficiently clear distinction between injuries to property and 'injured in his business or property,' the latter being the language of the act of Congress."

Mr. Justice Holmes stated: "The material provisions of the Tennessee Code are as follows: By Article 2769 (Shannon, 4466), all civil actions are to be commenced within the period prescribed, with immaterial exceptances. By Article 2772 (Shannon, 4469), actions, among others, 'for statute penalties, within one year after cause of action accrues'. By 2773 (Shannon, 4470), 'Actions for injuries to personal or real property; actions for the detention or conversion of personal property, within three years from the accruing of the cause of action'. By 2776 (Shannon, 4473), certain actions enumerated, 'and all other cases not expressly provided for, within ten years after the cause of action accrued.' The circuit court of appeals held that the case did not fall within 2772, or 2773, but only within 2776, and therefore was not barred. Although the decision is appealed from, as this question involved the construction of local law we cannot but attribute weight to the opinion of the judge who rendered the judgment, in view of his experience upon the supreme court of Tennessee. And although doubts were raised by the argument, we have come to agree with his interpretation in the main." The opinion concluded that "the dragnet at the end, 2776, catches all cases not 'expressly provided for'." The final remark was made that: "On the whole case we agree with the court below."

In the context, it is interesting to observe the similarity in pertinent aspect between the Sherman Anti-Trust Act under interpretation in the City of Atlanta case and the Taft-Hartley Act under in-

terpretation here. The former contains this sentence: "Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue, etc." The latter (Taft-Hartley) provides: "Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue, etc." Both acts seem plainly to distinguish between injury to a man's business and injury to his property. It seems logical to infer that injury to business *or* property, being covered in both acts, means that they are separate wrongs; and that the fact that the three-year statute of limitations applies to *personal property* would make the ten-year statute under its catch-all coverage apply to injury to business. We agree with the conclusion of the district court that the Sanford-Day Iron Works, case, supra, does not disapprove by implication the well established doctrine of the City of Atlanta case. The statute relating to jurisdiction of the chancery court was involved in the Sanford-Day case. The statute here under consideration was not even involved in the Sanford-Day case.

After consideration of cases cited in Judge Lurton's opinion in the City of Atlanta case and other Tennessee authorities brought to our attention, we hold the opinion, as did the district judge, that the ten-year statute of limitations of Tennessee and not the three-year statute applies to the present case.

■ In view of the substantially supported findings of fact of the district court, which have been detailed in the earlier part of this opinion, it would seem unnecessary to labor the point that there appears adequately sufficient evidence in the record to support the findings of the court that appellant set out by violence and threats of violence against appellee, its employees and customers, to accomplish its objective of "organizing" appellee's mine. Such conduct constituted an unlawful interference with appellee's business, in violation of the common law of Tennessee. See Brumley v. Chattanooga Speedway & Motordrome Co., 138 Tenn. 534, 198 S.W. 775, supra. No opinion of the Supreme Court of the United States has recognized the right of a labor organization to use violent means to accomplish the lawful ends of plant organization.

Appellant stresses in its behalf the authority of United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 403, 67 S.Ct. 775, 91 L.Ed. 973. There, the court stated that the purpose and effect of section 6 of the Norris-LaGuardia Act, 29 U.S.C. A. § 106, was to relieve organizations, whether of labor or of capital, and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration.

■ The answer is that, in the instant case, the facts as found by the trial judge, based on substantial evidence, are that the operations of Ridings, international board member of appellant, and several of its other international representatives, were definitely either authorized by appellant, or ratified by it after obtaining actual knowledge of the unlawful acts perpetrated. As found by the district court, the purpose of appellant in organizing and directing the march on appellee's mine was, by force and violence, to close its operation until appellee should sign a labor contract with appellant. Indeed, Ridings, who was general director of the activities of the mob of marchers and the other union members who participated in the unlawful acts, was high enough in the hierarchy of the United Mine Workers of America to render that organization liable for the consequences of conduct of its members under his general leadership. Cf. United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, 47 A.L.R.2d 850.

In a recent opinion of this court (September 26, 1958), Mr. Justice Stewart (then a member of this court) said that a jury had been properly instructed by the district judge that the unions involved were responsible for the acts of their representatives only if the latter were engaged within the scope of their employment or authority; but that actual authorization of specific acts was unnecessary. Citing 29 U.S.C.A. § 185(e). Lewis v. Benedict Coal Corporation, 6 Cir., 259 F.2d 346, 352. This able jurist added: "Moreover, the fact, if it is so, that field representatives of the District lacked actual authority to call strikes is not controlling. These representatives were sent by the District to attempt to settle local disputes at the Benedict mine. The declarations attributed to Scroggs all took place while he was on these missions. The calling of the strike was clearly one way to 'settle' a labor dispute although a way not permitted by the agreement. Consequently the jury were amply justified in finding that Scroggs was acting within the scope of his employment when he made the declarations in question. Compare, United Mine Workers of America v. Patton, 4 Cir., 1954, 211 F.2d 742, 47 A.L.R.2d 850, with Garmeada Coal Co. v. International Union, D.C.E.D.Ky.1954, 122 F.Supp. 512, affirmed 6 Cir., 1956, 230 F.2d 945."

■ This court has held, in United Brick & Clay Workers of America v. Deena Artware, 6 Cir., 198 F.2d 637, 642, that the court of appeals has no right to set aside findings of fact, either of the jury in an action by the employer against a labor union for damages caused by secondary boycott, or of a trial examiner in a National Labor Relations Board proceeding to enforce its cease and desist order against the employer, though such findings are inconsistent, if they are supported by substantial evidence on the record considered as a whole in each proceeding.

■ Undoubtedly, there was adequate substantial evidence to support the award of $300,000 compensatory damages for the wrongs and injuries inflicted upon appellee's business by the United Mine Workers of America. We are of opinion, moreover, that it rested within the sound discretion of the district judge to award $100,000 as punitive damages. The conduct of the appellant, through its agents, was of such wilful and malicious character as to justify an award of punitive damages. In its recent opinion in International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW–CIO) v. Russell, 356 U.S. 634, 640, 641, 78 S.Ct. 932, 936, 2 L.Ed.2d 1030, Mr. Justice Burton, speaking for the Supreme Court, said: "In the Laburnum case, supra, the union, with intimidation and threats of violence, demanded recognition to which it was not entitled. In that manner, the union prevented the employer from using its regular employees and forced it to abandon a construction contract with a consequent loss of profits. The employer filed a tort action in a Virginia court and received a judgment for about $30,000 compensatory damages, plus $100,000 punitive damages. On petition for certiorari, we upheld the state court's jurisdiction and affirmed its judgment. We assumed that the conduct of the union constituted a violation of § 8(b) (1) (A) of the Federal Act [National Labor Relations Act, 29 U.S.C.A. § 158(b) (1) (A)]. Nevertheless, we held that the Federal Act did not expressly or impliedly deprive the employer of its common-law right of action in tort for damages."

For the foregoing reasons, the judgment of the district court is affirmed.