Paul GIBBS, Plaintiff-Appellee,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.

Paul GIBBS, Plaintiff-Appellant,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellee.

Nos. 15624–25.

United States Court of Appeals
Sixth Circuit.

April 6, 1965.

Clarence Walker, Chattanooga, Tenn., and William Ables, Jr., South Pittsburg, Tenn., Van Derveer, Brown & Siener, Chattanooga, Tenn., of counsel, for Paul Gibbs.

Willard P. Owens, Washington, D. C., and E. H. Rayson, Knoxville, Tenn., R. R. Kramer, Knoxville, Tenn., on the brief, for United Mine Workers.

Before CECIL, O'SULLIVAN and PHILLIPS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Plaintiff Paul Gibbs, appellee in No. 15,624 and cross-appellant in No. 15,625, recovered a $75,000 judgment entered on a jury verdict against defendant United Mine Workers, appellant in No. 15,624 and appellee in No. 15,625. No. 15,624 presents the United Mine Workers' appeal from such judgment. No. 15,625 is Gibbs' cross-appeal from the setting aside of one item of the jury's award of damages. This case is the latest in a series in which we have considered the collisions between the UMW and those who have sought to operate coal mines in Kentucky and Tennessee without signing UMW contracts.[1] The violence here involved was less spectacular than that described in those decisions. From the evidence,

1. UMW v. Meadow Creek Coal Co., 263 F. 2d 52 (CA 6, 1959), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959) ; UMW v. Osborne Mining Co., 279 F.2d 716 (CA 6, 1960), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960); Gilchrist v. UMW, 290 F.2d 36 (CA 6, 1961), cert. denied, 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76 (1961); Flame Coal Co. v. UMW, 303 F.2d 39, 97 A.L.R. 2d 1136 (CA 6, 1962), cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962) ; Sunfire Coal Co. v. UMW, 313 F. 2d 108 (CA 6, 1963), cert. denied, 375 U. S. 924, 84 S.Ct. 268, 11 L.Ed.2d 166 (1963); White Oak Coal Co. v. UMW, 318 F.2d 591 (CA 6, 1963), cert. denied, 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1964); Allen v. UMW, 319 F.2d 594 (CA 6, 1963); Price v. UMW, 336 F.2d 771 (CA 6, 1964), cert. denied, 85 S.Ct. 899 (U.S. March 1, 1965) (No. 791).

the jury could and did find that by violence and continued picketing the UMW prevented the Grundy Mining Company from opening a coal mine field in the Gray's Creek area of Marion County, Tennessee, and thereby deprived plaintiff Gibbs of his contracts to superintend the mine operation and to truck coal from the mines. Gibbs' complaint charged in substance that the objective of defendant's conduct was to induce and force employees of Grundy Mining Company to refrain from working in the mines, thereby causing Grundy to cease doing business with him as its superintendent and as an independent trucking contractor. His pleadings asserted that defendant's actions constituted a secondary boycott prohibited by Sections 8(b) (4) and 303 of the National Labor Relations and Taft-Hartley Acts, 29 U.S.C.A. §§ 158(b) (4) and 187, and violated the common law of Tennessee as an unlawful interference with his contracts of employment and haulage.

Motions to dismiss and for direction of a verdict were denied. Interrogatories submitted to the jury called for separate answers on each issue in the case, and by its answers the jury found defendant guilty of the charged violations of the Federal Statute and of the common law of Tennessee. The jury found that 1) UMW had struck Grundy, had induced or encouraged its employees to strike, and had threatened, coerced or restrained Grundy; 2) that an object of such activity was to force Grundy to cease doing business with Gibbs as to his trucking and employment contracts; 3) that such activity was not aimed at Grundy in a primary capacity; 4) that Grundy was engaged in commerce or an industry affecting commerce; 5, 6, 7) that UMW was party to a conspiracy to wrongfully interfere with Gibbs' contracts in violation of Tennessee law; 8, 9) that Gibbs suffered $60,000 damages with respect to his employment contract, and $14,500 damages as to the trucking contract; 10, 11) that Gibbs was entitled to recover $100,000 punitive damages. Upon the basis of the foregoing findings, the District Judge made the following rulings in disposing of defendant's motions for judgment n. o. v. or for a new trial:

1) That the loss of Gibbs' hauling contract was caused by a secondary boycott as well as by a common law conspiracy, but that the jury's award of $14,500 damages for such loss must be set aside since as a matter of law his proofs as to loss of profits had no probative value. This latter ruling is the subject of Gibbs' cross-appeal in No. 15,625.

2) That interference with Gibbs' contract of employment as mine superintendent was not a secondary boycott because in his status as an employee he could not be "any other person" vis-a-vis the Grundy Mining Company as that term is used in 29 U.S.C.A. § 158(b) (4) (B). That this follows from Seeley v. Brotherhood of Painters, etc., 308 F.2d 52, 60 (CA 5, 1962) where the Court dealing with a discharged employee's reliance on that Section, said

"It is the appellant-plaintiff's contention that the labor organization caused his injury by 'forcing or requiring *any person* * * * to cease doing business with *any other person* * * *,' that is, by requiring his employers, Wiscombe Southern and Earl Paint Corporation, to discharge the plaintiff. We are cited to no case where the language 'to cease doing business with any other person' as used in this section has the same meaning as to discharge an employee. Literally, it could have that meaning but that would be foreign to the whole purpose of the section which has to do with a secondary boycott ban. No secondary boycott was involved in this case."

3) That even though Gibbs could not rely on the Federal secondary boycott statute to recover for loss of his employment contract, defendant's conduct did permit recovery for such loss under the common law of Tennessee; that because Federal jurisdiction was properly invoked as to Gibbs' claim for loss

of his hauling contract it was proper to allow recovery under state law for the loss of his employment contract under the doctrine of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), and under this Court's decision in UMW v. Meadow Creek Coal Co., 263 F.2d 52 (CA 6, 1959), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959) and cases following Meadow Creek.

4) That improper argument by plaintiff's counsel did not vitiate the entire verdict, and should be considered only in appraising its claimed excessiveness.

5) That the $60,000 award for loss of Gibbs' employment contract was excessive by $30,000, the $100,000 award of punitive damages was excessive by $55,000, and that a new trial must be granted unless plaintiff remit such excessive parts of the awards.

The required remittiturs were accepted by plaintiff, and final judgment was entered in total amount of $75,000.

Turning to the factual background of these rulings, plaintiff Paul Gibbs had been engaged in the coal mining industry for many years, presumably as a miner, as a trucker and trucking contractor, and as a mine operator. In 1959 and 1960, two companies, Tennessee Consolidated Coal Company, referred to herein as Tennessee Consolidated, and Tennessee Products and Chemical Corporation, referred to herein as Tennessee Products, owned and were producing coal in the area in question. Gibbs had been working as a trucker and, as lessee of Tennessee Products, as a mine operator under contract with UMW. Tennessee Consolidated had had contracts with UMW, but after unsuccessful negotiations it terminated such contracts in early 1960 and its operations in what was known as the Coal Valley Mine were shut down by a strike. Prior to August, 1960, Tennessee Consolidated organized a subsidiary called Grundy Mining Company for the purpose of commencing operations in its Gray's Creek holdings. It sought to carry on this operation without a UMW contract, and to that end a number of employees

were recruited without notice to former Coal Valley Mine workers, members of UMW. Notice of the new operation, however, was communicated in some manner to one John D. Cain, Jr., a representative of the rival Southern Labor Union. Grundy's president contacted plaintiff Gibbs on August 12, 1960 and they made a verbal contract whereby Gibbs was to be superintendent of the work at Gray's Creek at a starting salary of $600 per month and, as an independent operator, was to furnish trucks and haul the coal produced at Gray's Creek for a price of seventy-eight cents per ton.

The Gray's Creek area was within UMW District 19, whose representative there was one George Gilbert. More particularly, Gray's Creek was within the jurisdiction of defendant's Local No. 5881, whose members had worked at the Tennessee Consolidated Coal Valley Mine. The plan to open up Gray's Creek became known and on Sunday, August 14, pursuant to a posted notice and the call of their president, members of Local No. 5881 met to consider the prospective opening. Monday, August 15, several members of Local No. 5881 went to the entrance of the Gray's Creek work site shortly after Paul Gibbs' arrival there in the early morning. Paul Gibbs, John Cain, representative of the Southern Labor Union, and a number of miners hired to work at the Grundy mine were then and there persuaded not to attempt to commence work. There was evidence that such persuasion was aided by the display of firearms. The next day, August 16, Gibbs, Cain and a substantial number of miners who had been employed by Grundy again arrived at the mine site. Again, they were persuaded and induced not to go to work. This time, however, the persuasion was more impressive. A crowd estimated at 75 to 125, including members of Local No. 5881 was on hand, a large number carrying various types of firearms. It will be sufficient to say that by display and pointing of guns, by beating Cain and burning his brief case, and by "escorting" Gibbs and Cain out of the area by a motorcade, the Mine Workers

effectively induced Grundy's employees not to go to work and prevented Grundy Mining Company from opening the Gray's Creek mine. This threshold success was thereafter made secure by around-the-clock picketing of the entrance to the mine area. Picketing continued for eight or nine months during which Grundy Mining Company made no further effort to open the mine.

The proofs were sketchy as to defendant's responsibility for the described conduct. It was stipulated that defendant would be liable for action taken by District 19 representative Gilbert in the course of his employment. Gilbert and members of the Local testified that Gilbert neither knew of nor inspired the Sunday meeting or the conduct which followed on Monday and Tuesday. Gilbert testified that he was at a meeting at Middlesboro, Kentucky, on the two days of violence and did not learn of the "spontaneous" action of the Local members until Tuesday. He said that he was then advised by his superiors to repair to the mine site and see to it that the pickets behaved thereafter. It is clear that after the initial success of the violence, the fruits thereof were made secure by picketing which was approved by and was under the control of District 19; UMW subsistence payments were made to the picketers as well as to other unemployed mine workers.

In support of his contention that the UMW through its representative Gilbert knew of and probably inspired the Local's conduct, and that he, Gibbs, was personally the primary target of the described activities, Gibbs offered a miscellany of proofs. He testified that "to the best of my knowledge" he saw Gilbert's car at the scene of the events of August 15 or August 16 and that "I'm thinking that I seen Mr. Gilbert drive up there," although Gibbs also stated that "he [Gilbert] didn't play any part that I seen"; that on August 18 he called Gilbert to inquire why he hadn't shown up for an arranged meeting with Gibbs and asked Gilbert what he wanted of Gibbs, and

Gilbert replied, "I want you to keep your damn hands off of that Gray's Creek area over there and tell that Southern Labor Union that we don't intend for you to work that mine." Gilbert's attitude toward Gibbs was further portrayed by his statements to another that, "Hell, we can't let that go on," and that "Paul was trying to bring the other union in there, and he [Gilbert] said he ain't going to get by with it." A third witness reported Gilbert as saying, "Paul was trying to bring the Southern Labor Union into the coal fields," and "he said the union wouldn't let him do it," and "they had ways of preventing him from doing it * * * he seemed to think Gibbs was going to have to go," and "he said he had friends in high places that could move him out from the mining business." Further evidence of a purpose to impede Gibbs' continued pursuit of the mining business was furnished by proof that within a week or so after the violence of August 15 or 16, a sack was burned at the mouth of another mine then being operated by Gibbs under a lease with another owner; that the smoke from such a burning would suffocate workers in the mine if they stayed there long enough, and that the belt on an exhaust fan had been cut several times. There was no proof directly connecting any member of defendant union with this activity.

Some evidence was also offered to show that overt threats or acts of violence were not limited to August 15 and 16. There was proof that on one occasion during the continued picketing of the Gray's Creek mine a visitor to the area observed a rifle against a log at the side of the road near a tent presumably used by the pickets. George Gilbert was among the group of men there present and told the visitor that he could not go down the Pocket Road (near the Gray's Creek mine site) but suggested another route to the visitor's destination along which he would observe some of Gilbert's men, whom he was to tell that Gilbert said it was all right to pass. Further evidence of the union's purpose to use force to keep

Grundy from operating the mine was provided by proofs that on August 17 or 18, after Gilbert presumably took charge of affairs, a crowd of about 100 to 125 men, some recognized as members of the UMW, gathered near the office of Tennessee Consolidated Coal Company (parent of Grundy Mining) at Palmer, Tennessee. Two officers of the company were harassed by the crowd, some of whom were carrying guns. One of the company officers was manhandled and cursed, and one of the crowd "put a 30-30 carbine on" him as he was getting into his car.

There was evidence that after the events of August 15 and 16, Gibbs was unable to get haulage contracts with various operators, including some for whom he had hauled before. Ultimately he lost some of his trucks. He was also unsuccessful in getting employment as a mine superintendent and in due time leases that he had had with the Tennessee Products & Chemical Company were cancelled. Some time in 1961, Tennessee Consolidated made a contract with the Chicago firm of Allen & Garcia. This firm entered into a contract with the UMW, reopened and operated the Coal Valley Mine and then in July, 1962, started extensive operations in the Gray's Creek area. It was shown that Gray's Creek was one of the best coal areas in the region and that it had been contemplated that eventually Grundy Mining was to have opened around ten mines there. Grundy soon took over from Allen & Garcia and these plans were substantially accomplished. An official of the Tennessee Consolidated Coal Company testified that after the Gray's Creek area was finally opened, Paul Gibbs was not hired because "Had I hired Mr. Paul Gibbs none of these mines would be open today"; that they would be closed by "the members of the United Mine Workers of the area." The truth of most of the foregoing testimony was challenged by defendant's contrary proofs but resolution of the factual issue made was for the jury, if the case was properly submitted to it. We hold that it was.

1) *Was there evidence of a secondary boycott?*

■■ Appellant UMW contends that the activities described constituted a single primary strike at the premises of Grundy Mining Company to force the hiring of UMW members. The jury, however, found that an object of the defendant's activities was to force the Grundy Mining Company to cease doing business with Gibbs with respect to his contract of employment and his hauling contract. It also found that the union's activity was not a primary strike or primary picketing of Grundy Mining Company. The District Judge set aside the jury's finding of a secondary boycott as to Gibbs' employment contract for the reasons noted above, but sustained its finding of a secondary boycott as to his hauling contract. For the reasons outlined below, we find it unnecessary to determine whether Gibbs ultimately proved the existence of illegal secondary boycott pressure as to either contract. We share the District Judge's view that "the statement in the Electrical Workers case [Local 761, Intern. Union of Elec., etc., Workers v. NLRB, 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961)] that 'the distinction between legitimate "primary activity" and banned "secondary activity" * * * does not present a glaringly bright light' is an effective understatement of the complex and vague wording of the sections of the Act here involved." Certainly here it is difficult to separate the "primary" from the "secondary" and to demonstrate with complete assurance the duality of defendant's objectives. If solution of the problem is a matter of factfinding, the jury's verdict would foreclose further inquiry. But if the answers must be found in a conclusion of law, we are at least satisfied that the federal questions presented by plaintiff's pleadings and proofs were not so "plainly unsubstantial" as to destroy federal jurisdiction. Once District Court jurisdiction had thus attached, the doctrine of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933) permitted the jury to consider whether the

same facts claimed to make out a case of secondary boycott did not also prove that a Tennessee common-law tort had been committed by the defendant. The jury's express determination that such a tort had indeed been committed is sufficient to sustain its award of damages, so we find no need to review its determination of the secondary boycott claims.

Our present application of the doctrine of pendent jurisdiction is not novel. In Hurn v. Oursler, Mr. Justice Sutherland quoted from Siler v. Louisville & N. R. R. Co., 213 U.S. 175, 191, 29 S.Ct. 451, 455, 53 L.Ed. 753, 757 (1909), where the Court ruled that once federal question jurisdiction had been acquired the circuit court "had the right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or *even if it omitted to decide them at all, but decided the case on local or state questions only.*" (Emphasis supplied.) UMW v. Meadow Creek Coal Co., 263 F.2d 52 (CA 6, 1959), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959) applied this theory in a case where, as here, the same conduct was claimed to constitute both a secondary boycott and a conspiracy prohibited by Tennessee common law. There the UMW argued that "the trial court, having in effect held that there was no violation of the federal Act, had no jurisdiction to determine and decide the common law or non-federal cause of action." 263 F.2d 59. We upheld federal jurisdiction to grant relief under state law, however, observing that "the claim of secondary boycott and unlawful conspiracy are not separate causes of action, but merely different grounds to support a single cause of action." 263 F.2d 60. We have continued to apply the rule of pendent jurisdiction, most recently in Price v. UMW, 336 F.2d 771, 775 (CA 6, 1964), cert. denied, 85 S.Ct. 899 (U.S. March 1, 1965) (No. 791), and we are pointed to no persuasive reason for refusing to apply it here.

We are satisfied that plaintiff's evidence clearly made out a case for the jury upon the claim of common-law tort. The jury's answer to the interrogatory in this regard is independent of the secondary boycott finding and is sufficient to sustain the damage award.

2) *Did federal preemption foreclose action under the state common law?*

■ Appellant next argues that even assuming that jurisdiction to determine a state claim for interference with Gibbs' contracts would otherwise exist, federal law has preempted the existence of any such claim. Primary reliance is placed on Local 20, Teamsters, etc., Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), reversing our decision in Morton v. Local 20, Teamsters, etc., Union, 320 F.2d 505 (CA 6, 1963). We disagree with this argument. The Morton case decided only that where a state claim arising from a labor dispute did not rely on violence as part of the charged tortious conduct, it could not be prosecuted independently of, or pendent to, an action under the Federal Act. In Morton there was no charge of violence to support the state common-law action. It had been held in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 781, 3 L.Ed.2d 775 (1959) that absent violence, state common-law actions for torts arising from conduct arguably protected or prohibited by the National Labor Relations Act were preempted by the superior Federal interest. The Supreme Court, however, noted that,

"we have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. United Automobile Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030; United Construction Workers v. Laburnum Corp., 347 U.S. 656, [74 S.Ct. 833, 98 L.Ed. 1025]."

In our decision in Price v. United Mine Workers, supra, we noted the inapplicability of Morton where "unlawful acts of force and violence" are involved.

Appellant argues, however, that the UMW did not authorize or know of the

violence of August 15 and 16 engaged in by members of its Local, and in any event that there is no way to distinguish damages flowing immediately from the initial violence and those which may have come to Gibbs from the subsequent eight months of picketing which effectively and permanently took away the benefits of his contracts with Grundy Mining Company. Wholly apart from our view that there was circumstantial evidence from which the jury could find that District 19's representative Gilbert had a part in arranging the events of August 15 and 16, we gain the impression that the threat of violence remained throughout the succeeding days and months. The night and day picketing that followed its spectacular beginning was but a guaranty and warning that like treatment would be accorded further attempts to open the Gray's Creek area. The aura of violence remained to enhance the effectiveness of the picketing. Certainly there is a threat of violence when the man who has just knocked me down my front steps continues to stand guard at my front door.

Whether it be inferred that defendant UMW through its agents had a hand in planning and carrying out the original violence, whether they ratified the violent conduct by using it to make effective the subsequent so-called peaceful picketing, or whether the violent character continued as a threat throughout the entire picketing, we believe that violence was part of the common-law tort involved, and action therefor was saved from preemption by the rule of San Diego Bldg. Trades Council v. Garmon, supra; International Union, United Automobile Workers v. Russell, supra; United Construction Workers v. Laburnum Corp., supra.

3) *Improper argument to jury.*

■■ The UMW contends that in all events a new trial should have been awarded because of improper argument to the jury. The District Court conditionally denied the motion for new trial, ruling that,

" * * * the argument was improper. While an advocate may share his client's prejudices against an adversary, he cannot properly share them with the jury, particularly when they do not relate to any matters in evidence. However, the Court is of the opinion that the argument was not so prejudicial as to warrant a new trial, but should rather be taken into consideration by the Court upon the issue of excessiveness of the verdict."

Finding the verdict of compensatory damages for loss of Gibbs' employment contract excessive by $30,000, and the verdict of punitive damages excessive by $55,000, denial of a new trial was conditioned upon acceptance of a remittitur in those amounts. Gibbs accepted the remittitur.

It is now argued that "the District Court clearly found that the argument did prejudice United Mine Workers rights, and that such a finding absolutely requires a new trial." It is the law that where an excessive verdict results from appeals to passion, prejudice, or caprice, a remittitur may not be employed to cure the error. Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243 (1931); Ford Motor Co. v. Mahone, 205 F.2d 267 (CA 4, 1953); Brabham v. State of Mississippi ex rel. Smith, 96 F.2d 210 (CA 5, 1938), cert. denied, 305 U.S. 636, 59 S.Ct. 103, 83 L.Ed. 409 (1938). We so held in National Surety Co. v. Jean, 61 F.2d 197 (CA 6, 1932).

Defendant's motion for a new trial charged that the jury's verdict was the result of passion, prejudice or caprice. Though thus challenged to do so, the District Judge did not find that the verdict was so infected. The District Judge found that counsel's argument was improper but we do not believe his statement that it was "not so prejudicial as to warrant a new trial" should be construed as expressing by negative implication a finding that the verdict was the product of passion, prejudice or caprice. The heart of his finding rather is revealed in his statement that the impropriety of the argument was "to be taken into con-

sideration \* \* \* upon the issue of excessiveness of the verdict." The peculiar nature of many of the remarks leads us to conclude that he found the remarks to fall within a very narrow category calculated to influence the size of a favorable verdict without affecting the determination on the merits. These remarks are set out in full in the margin to demonstrate why we have come to this conclusion, and why we find ourselves unable to disagree with the court's finding.[2] This finding distinguishes this case from the cases cited above where the trial judges had found the verdicts to be products of passion, and moves it into the traditional area where a remittitur may be employed to avoid an excessive verdict without resort to a new trial. Thus viewed, we do not find an abuse of discretion in the District Judge's action.

4) *Plaintiff's cross-appeal.*

■ By his cross-appeal, No. 15,625, plaintiff Gibbs challenges the District Judge's action in setting aside the jury award of $14,500 damages for interference with his contract to haul coal. The District Judge found that there was no probative evidence to support plaintiff's own $14,029.28 estimate of his lost profits and that such estimate was "admittedly based upon carrying loads in excess of the permissible weight limits \* \* \* under the laws of Tennessee." We agree with the District Judge.

Plaintiff's estimate of his lost profits rests on unwarranted assumptions. Using the contract price of seventy-eight cents per ton, he calculated at $27,300 the income from hauling 35,000 tons of coal under a contract for sale to the Redstone Arsenal. Expenses of hauling were then calculated at $13,270.72 *on the assumption* that the five proposed Gray's Creek mines would be producing 10,000 tons per week, although that assumption was based only on plaintiff's "about 30 years experience that I've had in coal mining." Since under this assumption the 35,000 tons of coal could be hauled in three and one-half weeks, the expense figure included wages, repairs, workmen's compensation insurance, truck insurance, payroll taxes, truck tags, telephone, and depreciation costs for only that length of time. Gibbs himself admitted at trial that he could not have delivered the coal in three and one-half weeks if production were at less than 10,000 tons per week. His production estimate is weakened on its face by his failure to attempt reasoned explanation of the figure chosen, by his

2. Counsel's remarks include the following:
  "Now, what they are doing is what I call legal warfare. They will do what they please, the law doesn't mean (snaps fingers) that to them \* \* \* And as Mr. Kramer told you, if you finally get down to damages, if it is not too much we'll pay it off and do it again. So what. If it is too much we will appeal it and stall a few years. Now, that is the way they work."
  "Now, this poverty in the coal field that Mr. Kramer was talking about \* \* \* We've got coal, and we've got men who want to work and mine coal. Now, who is the bugger? The bugger is the United Mine Workers of America, for the simple reason that they are going to pass work on their terms or else. And if a few people starve in the midst, what difference does that make \* \* \*"
  " \* \* \* in addition even if you awarded $100,000 [plaintiff's requested punitive damages] they would chuckle in their sleeves and walk out of this courtroom and laugh. They will pay off the $100,000 and say oh, well, so what. We've got mixed up, it cost us this much, new let's go back and do the same thing again. I give you my word that that is exactly what this Union is counting on. It's the same thing as a fellow that has been caught nine times driving while drunk, and every time he has been brought up they have fined him $1.00. As soon as he got out of the courtroom he would go get him another drink, and that is just exactly what this union is counting on here."
  "Now, we believe that all of those elements taken together \* \* \* adequately sustain a compensatory award of $250,000. Now, that sounds like a lot of money, but let me point out to you, look who you are dealing with, too. Don't overlook it. The International Union of the Mine Workers of America \* \* \* Certainly, they want you to be light on them, so they can pay it back and go over there and blow up another mine, or conduct similar activities."

implied admission that he did not really know what kind of equipment would have been available at the new mine sites, and by his assumption that he could have got the five mines up to a production of 2,000 tons per week each within the space of two weeks. Paul B. Callis, president of Tennessee Consolidated Coal and its subsidiary, Grundy Mining Company, provided testimony weakening the estimate much further by his statement that it had not been decided whether to open five mines at Gray's Creek or only two— "the basic plan was to open two mines to produce approximately 600 tons in each, per day * * *." Callis also estimated that it would take between six months and one year to get these two mines into full production.

The test which the Tennessee courts would apply in testing the sufficiency of evidence of lost profits under circumstances like those involved here is spelled out in Anderson-Gregory Co. v. Lea, 51 Tenn.App. 612, 620, 370 S.W.2d 934, 938 (1963):

" * * * when a contract though of some magnitude is informal, and * * * is not within the Statute of Frauds because it is a contract for labor, and nothing has been produced under such a contract but only preparation to produce has been made, * * * only in a clear case, where the proof of profits is devoid of any element of speculation and shows all proper means taken to minimize loss should a recovery be allowed for prospective profits."

Plaintiff's only proof of loss was his estimate based on the expenses of three and one-half weeks' operations. Such assumption as to production is too speculative to justify submission of such evidence to the jury. Any possibility of doubt, however, is removed by reviewing the finding of illegality in the proposed operations.

Without going into detail, it is clear that Gibbs' statement of the manner in which he proposed to perform his hauling contract involved violation of the existing laws limiting axle weights. We agree with the District Judge's conclusion that estimates of profits based on proposed violation of state axle-weight laws are of no probative value.

"Loss of profits may not be considered as an element of damages, where the business from which they would have resulted was, or would have been, conducted in violation of law."

17 C.J. Damages § 119. See also 25 C.J.S. Damages § 42b, p. 519; 15 Am. Jur. Damages § 157, p. 575; Annot., 52 L.R.A. 33, 66 (1913). The District Judge correctly relied on Shelley v. Hart, 112 Cal.App. 231, 297 P. 82 (1931), for his view that profit estimates which contemplate illegal operations will not support an award, especially where they provide no means of separating the legal from the illegal.

It is impossible to know how Gibbs' estimated profits would have been affected by legal operation instead of illegal. When this infirmity is added to an already uncertain showing, it must be agreed that no proper evidence was offered to support the jury verdict.

Judgment affirmed.