Lester MORTON, d/b/a Lester Morton Trucking Company, Plaintiff,

v.

LOCAL 20, TEAMSTERS, CHAUFFEURS, AND HELPERS UNION, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendant.

Civ. No. 8222.

United States District Court
N. D. Ohio, W. D.

Dec. 26, 1961.

---

Flynn, Py & Kruse, M. J. Stauffer,. Sandusky, Ohio, for plaintiff.

Goldberg, Previant & Uelmen, Hugh. Hafer, Milwaukee, Wis., for defendant.

KLOEB, District Judge.

Under date of December 16, 1960,. plaintiff filed his second amended complaint in which he alleges, in effect, the. following: That this action arises under the Labor Management Relations Act, 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et. seq.; that complainant is engaged in the trucking business as a sole proprietor under the name of Lester Morton Trucking Company, at Tiffin, Ohio, and that. defendant is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of

America; that, on the 17th day of August, 1956, at about 5:30 o'clock A. M., the defendant wilfully, maliciously and in pursuance of a conspiracy to injure, damage and destroy complainant's trucking business, caused approximately fifteen men to appear at the complainant's business premises and to picket said place of business with signs or banners, and that the aforesaid picketing by large numbers of men was caused to continue until August 21, 1956, on which date an injunction against picketing by more than two men at each entrance was issued by the Common Pleas Court of Seneca County, Ohio, and that said picketing by large numbers of men continued in violation of said injunction, and with the knowledge of and under the instructions of the defendant; that defendant unlawfully obstructed and interfered with complainant's right to freely engage in his normal business activities by wilfully and maliciously threatening various persons and corporations with which the complainant had contractual relations with picketing at their construction sites if they continued to do business with complainant; that defendant further unlawfully obstructed and interfered with complainant's right to freely engage in his normal business activities by inducing and encouraging, and attempting to induce and encourage, certain employers and the employees thereof, having contractual business relations with the complainant, to engage in a concerted refusal to continue such contractual business relations with complainant, and to force and require the complainant to recognize and bargain with the defendant, who was not certified as the representative of the employees of the complainant; that defendant further unlawfully obstructed and interfered with complainant's rights by wilfully and maliciously inducing and encouraging the employees of other employers to engage in concerted refusals in the course of their employment to perform services, all for the purpose of forcing and requiring such employers to cease doing business with the complainant; that the mass picketing and secondary boycott activities engaged in by the defendant against the complainant were in violation of the provisions of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq., and caused great damage to the complainant in that, among other things, (1) He lost numerous trucking jobs as a result thereof from which he would have received substantial profits but for said mass picketing and secondary boycott activities; (2) Numerous other jobs under contract by the complainant were delayed; and (3) Nearly all of complainant's trucking equipment was forced to remain idle during the aforesaid period of time.

Wherefore, complainant prays judgment against the defendant in the amount of $50,000.00 as compensatory damages and $50,000.00 as punitive damages.

In due course, defendant filed its answer, in which it generally denied the allegations of the second amended complaint.

It appears that the plaintiff had, for many years, been engaged in the trucking business in Tiffin, Ohio, and that he engaged, among other things, in general dump truck operations in which he used his own employees to operate a fleet of approximately fifty dump trucks which were used primarily in work on highway construction; that for some years prior to the year 1956 plaintiff's drivers were members of Local 625 of the Teamsters Union, and when that Union was merged into the defendant these employees became members of the defendant, and were such members throughout the period of the strike in question; that there was no contract between the defendant and the plaintiff prior to the strike in question.

It appears further that, in August of 1956, after plaintiff's drivers had met with representatives of the defendant, and had voted to strike in the event that the parties could not agree upon the terms of a contract, plaintiff met with representatives of the defendant on August 16, 1956, at the offices of the defendant in Fremont, Ohio; that no contract was concluded at that meeting, and that, in

the early morning of August 17, a large number of plaintiff's drivers and representatives of the defendant appeared at plaintiff's garage and office premises in Tiffin and initiated the strike against plaintiff, which continued until October 5, 1956, when a contract was signed by the parties; that said contract (Defendant's Exhibit D) was dated October 5, 1956, to expire March 1, 1959; that, at the time of the trial of this case in late April and early May of this year, there was no contract between the parties and apparently there is none at this date.

Plaintiff contends that the defendant engaged in unlawful strike activity during the strike when it encouraged the plaintiff's customers and suppliers, sometimes through their employees and sometimes directly, to stop doing business with the plaintiff; that, since the defendant engaged in unlawful activities against plaintiff, plaintiff is entitled to collect all damages he suffered as a result of defendant's total strike activity; that defendant violated both Federal statutory law and State common law, and that this Court, therefore, has jurisdiction to award damages.

Section 303 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 187, during the period complained of, provided, in part, as follows:

"(a) It shall be unlawful * * * for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * work on any goods * * * or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer * * * to cease using * * or otherwise dealing in the products of any other producer * * * or to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless

such labor organization has been certified as the representative of such employees * * *;

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court in the United States * * * without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

The unlawful secondary boycott by way of making direct appeals to a struck employer's customers or suppliers to stop doing business with the struck employer, which plaintiff complains of, is predicated upon several Ohio cases, and particularly the case of Moores & Co. v. Bricklayers' Union et al., 10 Ohio Dec.Reprint 665, 23 Wkly.Law Bull. 48 (affirmed by the Supreme Court of Ohio, 51 Ohio St. 605), and the case of Schmidt Packing Co. v. Local Union No. 346, Amalgamated Meat Cutters & Butcher Workmen of North America, et al., 48 ALC 547 (1947), and particularly the case of W. E. Anderson Sons Co. v. Local Union No. 311, International Brotherhood of Teamsters, etc., 156 Ohio St. 541, 104 N.E.2d 22; also upon 33 Oh.Jur. 2, Labor Sec. 64, Secondary Boycott, pages 187–188.

The right of recovery for damages for the common law tort of conspiracy is based upon the case of Perko v. Local No. 207, etc., et al., 168 Ohio St. 161, 151 N.E.2d 742 (1958).

Plaintiff relies upon the case of Carpenters Union, etc. v. Cisco Const. Co., (9th Cir.) 266 F.2d 365 (cert. den. 361 U.S. 828, 80 S.Ct. 75, 4 L.Ed.2d 70) in his claim that he may recover damages measured by all of the revenue lost as the result of the entire strike activity of the defendant. In other words, he relies upon the "totality effort" rule.

In his claim of jurisdiction in this Court, as well as his right to rely upon the common law of the State, in addition to the Federal statute, plaintiff relies upon

United Mine Workers of America v. Meadow Creek Coal Co. (6th Cir.), 263 F.2d 52 (cert. den. 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038) and United Mine Workers of America v. Osborne Mining Co. (6th Cir.), 279 F.2d 716 (cert. den. 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103, 1960), and, in addition thereto, the common law of Ohio with respect to punitive damages as set forth in 16 Oh.Jur.2d, Damages 281, Sec. 145 (Tort Actions, Generally), which reads, in part, as follows:

"It is an established principle of law in Ohio that in actions to recover damages for tort, which involve the ingredients of fraud, malice, or insult, or the wanton or reckless disregard of the legal rights of others, the jury may go beyond the rule of mere compensation of the party aggrieved, and award exemplary or punitive damages. * * *"

Plaintiff concedes that, to the extent that it was peaceful and non-massive, the picketing that occurred at the plaintiff's garage at Tiffin was lawful. He concedes that, if the defendant had limited itself to that type of lawful activity, plaintiff would not be entitled to recover any damages from the defendant. Plaintiff contends, however, that the defendant engaged in substantial unlawful activity during the period of the defendant's strike against the plaintiff, and that it is impossible to distinguish between the damages plaintiff suffered as the result of defendant's lawful activity on the one hand and the defendant's unlawful activity on the other.

Plaintiff's premises were struck on the 17th day of August, 1956, and, on August 21, 1956, pursuant to motion filed by plaintiff in connection with the complaint filed in the Common Pleas Court of Seneca County, Ohio, that Court issued a restraining order "restraining the individual defendants and each and all of them, and all persons associated with or acting in concert with said defendants and all others to whom knowledge of this order shall come:

"1. * * *

"2. From interfering with, or by violence, force, intimidation or threats, preventing or attempting to prevent plaintiff, his agents, employees, representatives, customers and others having business with the plaintiff, from entering or leaving plaintiff's place of business and from in any way interfering with, obstructing, delaying or stopping plaintiff's lawful operation of his business or maintenance of his equipment.

"3. From, whether by secondary boycotts or otherwise, interfering with, or by violence, force, intimidation or threats, preventing or attempting to prevent any of plaintiff's customers or any other members of the public from having business relations with the plaintiff.

"4. From following plaintiff's agents, employees and representatives on the public highways or elsewhere.

"5. * * *

"6. From picketing, other than peaceably and by more than two pickets at each entrance, the plaintiff's place of business or any part thereof.

"7. * * *

"8. * * *" (Plaintiff's Exhibit 2.)

We conclude, from the evidence, that, from and after the issuance of the aforesaid restraining order, defendant observed the requirements of paragraph 6 above, in that it thereafter confined its number of pickets at each entrance to the plaintiff's place of business to two. We further conclude from the record that, at no time during the strike period, to wit, August 17, 1956 to October 5, 1956, both inclusive, was violent conduct engaged in.

The defendant contends that the primary strike and picketing at plaintiff's premises was not in violation of Section

303 of the Labor Management Relations Act of 1947; that it engaged in no illegal conduct with respect to the secondary or neutral employers; that inducements of individual employees do not violate Section 303 of the Act; that the picketing at France Stone Co. and Schoen Asphalt Paving Co. was primary and lawful, and that the evidence does not establish an inducement of the employees of these two concerns; that the preemption doctrine is an affirmative one, and that exclusive jurisdiction is vested in the National Labor Relations Board; that the preemption doctrine applies to conduct allegedly constituting a common law secondary boycott, and that in this case neither Federal nor State Courts have jurisdiction to award damages; that since no violence or mob action is involved in this case the decisions heretofore cited, to wit, the United Mine Workers of America v. Meadow Creek Coal Co., supra, and the United Mine Workers of America v. Osborne Mining Co., supra, are inapplicable, that the defendant engaged in no conduct which violated the State Court restraining order, and that this Court should not, for various reasons, exercise authority to award punitive damages.

The defendant poses the following three questions as being the questions involved in this suit:

1. Whether the Union engaged in conduct which violates Section 303 of the Labor Management Relations Act of 1947;

2. Whether the Court has jurisdiction to entertain a claim for relief predicated upon an alleged common law secondary boycott;

3. Whether, in the circumstances of this case, punitive damages should be assessed against the Union.

The illegal acts complained of by plaintiff revolve around the France Stone Company, the Louis O'Connel Coal Company, the Launder & Son, Inc., and the C. A. Schoen, Inc. In addition thereto, the contracts involved those at the Wilson Sand & Gravel Co., and also the Seneca County contract.

During the trial of the case, which was tried to the Court, plaintiff's witness, William H. Heine, the Seneca County Engineer from Tiffin, Ohio, testified in connection with the contract that the County had with the plaintiff for the hauling of stone for hardtop roads. He testified that Mr. Morton performed under the contract until August 17, 1956, and that, sometime thereafter, Lawrence Evans, Business Agent of defendant, called at his office and asked him if he knew that a strike had been declared against Morton, and he replied that he did. However, on cross-examination, he stated that he had made the decision to discontinue with Morton several days before he was visited by Mr. Evans.

On the basis of this testimony, we concluded that the alleged unlawful activities of the defendant had nothing to do with the decision of the County Engineer to terminate the hauling contract with Morton, and that the damages claimed were too remote to be considered in any computation of damages. We sustained a defense motion to dismiss this claim and we, therefore, give it no further consideration.

▮ In connection with the Wilson Sand & Gravel Co. contract, at the trial of the case we were concerned with the possible pertinency of the failure of plaintiff to perform under the contract to the conduct of the defendant of its strike, but we believe that, under the totality of effort rule, alleged damages in connection with this contract should be considered.

We believe that the acts of the defendant in connection with the France Stone Co., where Lawrence Evans, Business Agent of the defendant, took men who were striking against the plaintiff with picket signs to the premises of the France Stone Company and there set up a picket line was wrong. Plaintiff's Exhibit 13, a photograph taken by plaintiff on either the 23d or the 24th day of August, 1956, some two or three days after the issuance of the restraining order by the Common Pleas Court of Seneca County, establishes, beyond refutation, that the France Stone Company was picketed. The testi-

mony of an employee of plaintiff, one John W. Combs, (Record, p. 113), that, about a week after the strike commenced, he and his brother Joe were taken to the France Stone Co. by defendant's officer Evans corroborates the Exhibit 13. That these pickets were viewed by the employees of plaintiff, as well as the France Stone Co., is well established. The activities of defendant's agent Evans in contacting employees of the France Stone Co. is established.

We believe that the activity of defendant's agent at the France Stone Co. was unlawful under Section 303 and was an apparent effort to injure and coerce the plaintiff.

In connection with the O'Connel Coal Co., which had been a customer of plaintiff for a number of years, it was the plaintiff's duty under the contract to haul all of the O'Connel Company's requirements of sand and gravel into its Tiffin plant for use in its ready-mix concrete manufacturing operation.

Here, through the activities of one Kenneth Lidster, an employee of the Coal Co., and a steward of the defendant local, and through the activities of Irvin Mowery, Business Agent of the defendant, the O'Connel people were alerted to the strike. Contacts were made with this company by Mowery by telephone, as well as by personal visits.

██ We believe that Section 303 was violated, in that the defendant encouraged the employees of the O'Connel Company to stop using plaintiff's trucks for the purpose of forcing or requiring the O'Connel Company to cease doing business with the plaintiff; that defendant's activity in connection with this company was unlawful under the common law of Ohio.

In connection with the Launder & Son, Inc. contract, plaintiff had a contract to transport the "batching" by truck to and at the site of a highway improvement that the Launder & Son Company was engaged in constructing. Here defendant's Business Agent Evans took strikers to the Launder job and, while there, talked to a boss on the Launder job, and asked him not to let any of plaintiff's trucks work there.

██ In connection with the C. A. Schoen, Inc. company, defendant's Business Agent Evans, together with some of the strikers, followed trucks of plaintiff to a stone quarry and then followed the trucks to Toledo to the premises of the Schoen company, where picketing was set up, where, following conversation with defendant's Business Agent Sullenger, Schoen refused to permit the sand transported by plaintiff to be received. Other activities in connection with Schoen were along the same general lines. We believe that these activities were in violation not only of the Federal statute but the State common law.

In the course of the trial, Irvin Mowery was the first witness called by plaintiff. He testified that he was an organizer for Local 20, and that Sullenger, Evans and Reagan also worked out of the Toledo office; that, on the morning of the strike, he observed Evans there and that there were around thirty of Morton's employees and three pickets on duty; that he went to the O'Connel Company the next day after the start of the strike, where the O'Connel employees were members of the defendant local; that he talked to their steward there and that, thereafter, he visited the O'Connel company once a week; that he talked with Howard Magers, Junior President of the O'Connel company, three or four days before the strike and told him of the possibility of a strike, and at strike time he called Mr. Magers on the telephone and asked his cooperation.

John W. Combs testified that he worked for plaintiff in 1956, and that he belonged to the defendant local; that, on the first day, he stood picket at 8:00 A.M. and around 25 men were out there; that he appeared again the next day and that the same number of men were there, and that when the Court order issued 6 or 8 were there at any one time; that he went out to the France Stone Company with his brother under the direction of Mr. Evans and there set up a picket with signs;

that Evans took him and his brother Joe to Fremont where the by-pass of Route 20 was being constructed by the Launder Company, and that Evans told the man at the gate not to let Morton's trucks in, and the man responded "I would like to go along with you"; that he and his brother and James Marcum, together with Evans, followed three of Morton's trucks as they came out empty at 9:00 A.M. to Maple Grove quarry five miles north of Tiffin where the trucks were loaded with No. 8 sand, and that they then followed the trucks into Toledo to the Schoen Asphalt Company where Evans talked with someone, and the trucks were not unloaded; that the drivers of the trucks left in a car, and that he and his brother got out with a picket sign along with James Marcum and placed themselves at the entrance. On cross-examination, he testified that after the Court order had issued the number of pickets at the entrances was reduced to 4.

Hubert Olds testified that he was a mechanic at the France Stone Company and a member of the operating engineers' Union; that a teamsters' Union man talked with the Plant Superintendent, C. C. Robinson, and himself.

Witness Vernon Beam testified that he and Stokes and Cliff Smith took three trucks to the Dolomite quarry and loaded them with sand, and that they were followed by Evans, accompanied by Joe and John Combs; that they pulled into Schoen Asphalt just a few seconds after the trucks arrived; that Evans went into the office and that the Schoen Superintendent came out and "told us we couldn't unload"; that no trucks were unloaded and that "we left with Mr. Morton in his car"; that at the Schoen gates he saw two picket signs on each side of the entrance; that the Project Engineer at the by-pass on Route 20 "told us to take our trucks off the job after Larry Evans came out of the office".

Witness Charles Robinson testified that he drove into the France plant where he was employed as a Plant Manager, and saw the men at the entrance with picket signs, and that a fellow then came in in a black Cadillac.

Howard Stultz testified that he worked for plaintiff in 1956, but that he is not now working for plaintiff; that his position was that of a mechanic, and that he drove a truck for plaintiff in August of 1956; that he worked as a mechanic in the garage until the third or fourth day of the strike when he hauled sand to Schoen Asphalt in Toledo from the Dolomite quarry; that he saw men standing around a car talking, but saw no signs; that a man came out of the office and "told us to leave the truck unloaded"; that when he left the men were still at the gate; that he drove into the France Stone Company during the strike and saw a sign there at least two days indicating "Morton Company on strike"; that he saw the two Combs boys and Nye with the signs.

Elmer Luttrell testified that he was employed by Launder & Son in 1956 as Field Office and Batch Plant Manager; that his employer was paving Route 20 by-pass; that they were using Morton's dump trucks and batch trucks, and that he was informed by Mr. Launder of the Morton strike; that after the strike three of Morton's trucks appeared for a short period of time; that Larry Evans "called me and asked if Morton's trucks were on the job".

Kenneth Lidster testified that he worked for the O'Connel Company in 1956, making ready-mix; that he drove a truck, and that the plaintiff "hauled our sand and I then belonged to Local 20"; that Irvin Mowery, one of defendant's Business Agents, called to see him, and that Mowery said they had a strike on Morton and he would just as leave "we didn't use his trucks"; that "I told our boss Howard Magers".

Howard Magers, Jr. testified that Kenneth Lidster "our Union Steward" informed me that Morton had been struck and he had been so informed by a teamster.

James Schoen testified that he was a paving contractor, Treasurer of Schoen Asphalt, and that Morton supplied sand

in 1956; that, on August 20, he saw a sign at his entrance "Morton's strike", and that there were people around; that he talked to Ed Sullenger, Business Agent of defendant, and Sullenger "told us we could not and should not deal with Morton on strike; that the trucks should remain unloaded"; that he further had two conversations in his office with Sullenger, "when he tried to persuade us not to do business with Morton"; that he had other conversations over the telephone with Sullenger, all occurring within a week after the strike commenced, all "trying to persuade us not to use Morton's sand"; that a Mr. Evans also joined with Sullenger in the first conversation, but that he could not identify Evans.

Ransom Taulbee testified that he worked for plaintiff in 1956; that he did not work during the strike, the reason was he did not want trouble, and that some trucks left plaintiff's during the strike, and that the trucks that left were followed by Evans and others; that he did not want to take a truck out and get followed or get hurt. On cross-examination, he testified that he saw Evans follow trucks more than once.

We have reviewed here some, but not all, of the activities engaged in by the defendant, through its Business Agents, in contacting suppliers and others that were doing business with the plaintiff in an apparent effort to discourage further business with plaintiff, and to injure the plaintiff in the operation of his business. Some of these activities, unfortunately, were engaged in after and in the face of the restraining order issued by the Common Pleas Court of Seneca County on the 21st day of August, 1956. Some of the contacts made by defendant's agents were made with employees of plaintiff's suppliers and companies with which the plaintiff was doing business, and some of the contacts were made with managers or superintendents or officers of these companies. All of them, apparently, had the same purpose in mind.

Looking at the picture as a whole, we conclude that the special damages suffered by plaintiff in connection with the Launder matter amounted to the sum of $8,684.92, in connection with the O'Connel Company in the amount of $1,644.79, and in connection with the Wilson Company in the amount of $9,289.91, for a sum total of $19,619.62. Compensatory damages, therefore, in the sum of $19,619.62 are awarded.

Coming to the question of punitive damages, we believe that some punitive damages should be awarded. The conduct of defendant, through its agents, constituting secondary activity was in violation not only of the Federal statute but of the common law of Ohio relative to secondary boycotts and conspiracy. Some of this activity, in violation of the restraining order of the Common Pleas Court of Seneca County, is regrettable.

Although the punitive damages awarded in the Meadow Creek and the Osborne cases, supra, were predicated substantially upon the extreme violence that pervaded the strikes, we see no reason why the award of punitive damages should be limited to cases where violence is engaged in. Here the objective was to bring the plaintiff to his knees, and the means employed were unlawful. An award of $15,000.00 as and for punitive damages is assessed.

In the course of our consideration of this case, we have not only studied and considered the cases of the United Mine Workers and the Osborne Company, supra, but also, in particular, the following cases: Local Union No. 984, etc., et al. v. Humko Company, Inc., etc., et al. (6th Cir.), 287 F.2d 231 (cert. den. 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254); Carpenters Union, Local 131 et al. v. Cisco Construction Co, etc. (9th Cir.), 266 F.2d 365 (cert. den. 361 U.S. 828, 80 S.Ct. 75, 4 L.Ed.2d 70), and the case of United Brick & Clay Workers of America et al. v. Deena Artware, Inc. (6th Cir.), 198 F.2d 637, which is cited in the Cisco case, supra; also the case of Gilchrist, et al. v. United Mine Workers of America (6th Cir.), 290 F.2d 36 (cert. den. 82 S.Ct. 120).

Plaintiff may, within fifteen (15) days, prepare and lodge with the Court

Findings of Fact and Conclusions of Law drawn in accordance with this Opinion. Defendant may, within fifteen (15) days thereafter, note its exceptions or suggested additions thereto.

An order may be drawn accordingly.