**SHAW–HENDERSON, INC., Plaintiffs,**

v.

**R. J. SCHNEIDER, Regional Construction Grants Program Director, Environmental Protection Agency, Region 5, Water Quality Office, Chicago, Illinois and City of Charlevoix, Michigan, Defendants.**

**No. G–118–71 CA 7.**

United States District Court,
W. D. Michigan, S. D.

June 25, 1971.

As Amended Nov. 11, 1971.

Charles A. Boyle, Chicago, Ill., and Peter Patrick, Patrick & Johnson, Cheboygan, Mich., for Shaw-Henderson.

William J. Bauer, U. S. Atty., Chicago, Ill., for Schneider.

John Michael, Charlevoix, Mich., and Steven L. Dykema, Grand Rapids, Mich., for City of Charlevoix.

John Mitchell, Atty. Gen., Washington, D. C., for the United States.

## STATEMENT OF FACTS

ENGEL, District Judge.

The court has reviewed the entire record in the case which consists of those matters stipulated into evidence upon the record originally made May 14, 1971, as augmented by further stipulations and evidence received by stipulation at the time of the trial in the case on May 26, 1971. In the interest of brevity, however, the following is a summary of the facts in this case.

On June 3, 1968, the Michigan Water Resources Commission sent a letter to the City of Charlevoix hereinafter called "City", in which it requested the latter's voluntary commitment to remove phosphorous compounds from its waste water by building new facilities which would be in operation by December 1, 1972. The substance of the letter was that if the City did not voluntarily comply with the request of the Commission, the latter would initiate statutory procedures to enforce its request. Subsequently a stipulation was signed between the Water Resources Commission and the City (Exhibit K) whereby the City agreed to provide the facilities requested by the Water Resources Commission and in connection therewith, to meet certain deadlines which were set for preparatory studies, initial construction. The facilities were to be completed on or before December 1, 1972.

Defendant R. J. Schneider is Regional Construction Grant Program Director for Region 5 of the Water Quality Office, a Federal Agency charged with the responsibility of disbursing federal grants to qualified applicants for sewage treatment works, pursuant to Title 33 U.S.C. § 1151 et seq. (Formerly 33 U.S.C. § 466). To obtain federal participation in the project, the City on

September 15, 1970 accepted an offer by Schneider of a federal grant of $64,250 toward the cost of the project, then estimated at $1,295,000, the full particulars appearing in Exhibit B.

Thereafter, the City, having prepared an extensive document, Exhibit A, which contained all of the particulars and conditions of the construction of the project, solicited by advertisement the submission of bids in writing by contractors interested therein.

As evidenced by Exhibit A, the project proposed consisted essentially of the conversion of the existing waste water treatment plant in Charlevoix to a pumping station and in construction of a new primary, secondary and tertiary (microstrainer) waste treatment plant.

Two basic contracts were contemplated: Contract No. 70–S–1 which involved the pumping main, and Contract No. 70–S–2 which was divided into three divisions and included: Division A covering general construction and mechanical work; Division B covering electrical work and process instrumentation; and Division C covering out-fall sewer. Divisions A and B in Contract No. 70–S–2 are set forth and their specifications and conditions explained in Exhibit A. Because the bids received on December 11 were greatly in excess of estimates as to Divisions A and B, re-bids were solicited to be received not later than 2:00 p. m. February 23, 1971. Primarily at issue here are the bids received for Division A. Nine bids were so received by the time set. All bids were sealed and opened at that time and it was revealed that Clark Construction Company and plaintiff Shaw-Henderson, Inc., were the low bidders.

The bid on Division A had three deductible alternates; that is, the bidders were requested to specify how much they would deduct from the overall bid if three items of work were omitted. These pertained to deletion of the microstrainer which was part of the tertiary waste treatment process, the bituminous roadway and parking lot surfacing, and the substitution of latex paint on light weight concrete block with special coated light weight concrete block in the laboratory and office.

The total bid without omission of those items came to $1,190,245 by Clark and $1,190,500 by Shaw-Henderson, or only a $255 difference. If the deductible alternates were in fact to be omitted, the bid of Clark would be reduced by $46,100 and the bid of Shaw-Henderson would have been reduced by $49,795. Thus, on the basis of the total bid submitted, Clark was low bidder, but if the alternatives mentioned were to be deducted, Shaw-Henderson would thereupon have been the low bidder.

The bids as received on February 23, 1971, were referred to the engineering firm of McNamee, Porter & Seeley, consulting engineers engaged by the City for that purpose. Shortly thereafter, Mr. John M. Holland of the engineering firm, by letter dated February 25, 1971, (exhibit I) made his report to the mayor and city councilmen of the City. In it Mr. Holland recommended that the three deductible alternates not be omitted from the construction project and in this case and on this basis determined that Clark was low bidder. He thereupon recommended awarding the contract to Clark in accordance with its base bid of $1,-190,245. In a summary attached to his letter, Mr. Holland estimated the total project costs at $1,935,000 and listed as "funds available for project": cash in the amount of $190,240; general obligation bonds, $700,000; State and Federal aid, $1,064,250.

The City on March 8, 1971, following the recommendation of Holland, agreed to accept the Clark base bid without accepting any deductible alternates. It may be added here also that Holland in his letter to the City indicated that both Clark and Shaw-Henderson had a satisfactory financial statement, equipment and job experience to do the work.

Shaw-Henderson immediately took issue with the recommendation of Holland and the action of the City. By various communications and in particular by formal letter of protest addressed to Todd

A. Cayer of the Federal Water Quality Office dated March 29, 1971 (Exhibit H), plaintiff set forth in detail its claim that the bid of the Clark Construction Company was grossly irregular and should have been summarily rejected in favor of the Shaw-Henderson bid. In answer to the March 29 letter, Mr. Todd Cayer, on March 31, responded to the effect that the matter was one for decision by the City since the Water Quality Office would not be a party to any proposed contract. Mr. Cayer made reference to the assurances contained in the Offer and Acceptance and referred the letter to the City and the Michigan Water Resources Commission. (See Exhibit C).

The gravamen of Shaw-Henderson's complaint originally was summarized in its letter of March 29, 1971, as follows:

"1. Clark's bid contained a $70,000.-00 under statement of cost by its mechanical and plumbing subcontractor, Axtel Hardy.

"2. Clark's bid omitted the mandatory requirement of naming the pipe work subcontractor.

"3. Clark's stated bid was $40,000.00 less than the total sum of itemized costs for labor and materials.

"4. Clark's bid on the deductible items was less than Shaw-Henderson's."

Apparently the complaint was referred to Mr. Holland who, on April 2, 1971, in a letter addressed to the Federal Water Quality Administration made answer.

Mr. Holland detailed his response to the complaint and nevertheless re-affirmed his recommendation that the Clark bid be accepted.

It developed shortly after the opening of bids that the firm of Axtel Hardy had submitted to Clark a bid as subcontractor for the plumbing, heating, ventilating, and air conditioning which are set forth in item 36, appearing at page 5 of Exhibit A. This bid had been incorporated into Clark's final bid. Axtel Hardy had bid in the amount of $26,000 and then discovered that in fact it was in error and wished to withdraw its bid to Clark because it had understated its cost. The exact amount of the understatement is in dispute but was claimed by Shaw-Henderson to have been in the amount of $70,000. Clark thereupon allowed Axtel Hardy to withdraw its bid, but re-affirmed to the City that its total bid was firm and that it would submit to the City the name of another subcontractor in substitution therefor, subject to the approval of the City.

According to the affidavit of John Holland (Exhibit S) Clark submitted to Holland's firm the names of Wares & Son and Port City as being proposed subcontractors for both the plumbing and the pipe work. Holland informed the City Council that either of these subcontractors would be acceptable.

Item 17 of the Clark bid (Exhibit F) contained a bid of $160,000 for pipe work, but the name of the subcontractor was not listed in the bid. This Shaw-Henderson claimed to be in violation of the conditions contained on page IB–3 of Exhibit A. This provided in part: "Manufacturers' names have been entered under some items; the bidder shall name a manufacturer or subcontractor for each of the remaining items in the base proposal where requested." It is true that the name of the subcontractor was not so listed. Mr. Holland responded by referring to that section of the proposal appearing at page IB–4 of Exhibit A which states that: "The owner reserves the right to accept any proposal, to reject any or all proposals, and to waive defects or irregularities in any proposal."

With respect to the claim that Clark's total stated bid was $40,000 less than the total sum of itemized costs contained therein, the actual difference is $36,-000.00. This is explained by the existence of a clerical error wherein item 40 of Clark's bid for chemical storage tanks is listed at $40,000 rather than $4,000. This is patently apparent by comparing the same item on the other bids. To this Mr. Holland replied that it was true that the subdivision of work did not add up

to the contract price, but that the same was also true of the Shaw-Henderson bid and that in any event the contract sum as written was the firm bid price.

As previously pointed out, Shaw-Henderson's claim that the deductible items in Clark's bid were less than its own is true.

The plaintiff, through its counsel, was able to obtain, on April 22, 1971, a hearing before the Charlevoix City Council attended by its City Attorney, John R. Michael. The meeting lasted three and one-half hours, following which the Council again rejected plaintiff's protests and reaffirmed its prior approval of the Clark contract.

Another letter of protest from plaintiff's counsel, Mr. Boyle, to Schneider, followed on April 28, 1971, (Exhibit H–1). Immediately thereafter Charlevoix City Attorney John R. Michael on April 29, 1971, transmitted a telegram to Todd Cayer of the Water Quality Office (Exhibit E). That opinion contained the following language:

"I have researched the complaints and allegations made by the complaining party in each of the above occasions and have found them to be completely unsupported by law. I have reviewed and researched all applicable local ordinances, state statutes and cases as well as federal cases and statutes and offer the legal judgment that the City of Charlevoix has followed and complied with all such ordinances, statutes and case law in all respects as the same relate to the subject public project."

The telegram was received by the Water Quality office and on the same day, April 29, Schneider wrote the superintendent of the Waste Water Treatment plant at Charlevoix wherein he concurred in the award of the contract to Clark. Paragraph 2 of that letter provides as follows:

"In addition, based on a thorough review of all of the information pertaining to the City's proposed award of Contract No. 70–S–2(r), Division A, including the April 2, 1971 letters from Mr. Holland, your consulting engineer, and Mr. Michael, your City Attorney, we hereby concur in the City awarding this contract to Clark Construction Company in the eligible amount of $1,190,245. It should be clearly understood that our concurrence in the City's awarding this contract is based on the April 29, 1971 legal opinion prepared by Mr. Michael."

The instant law suit was commenced in the United States District Court for the Northern District of Illinois, Eastern Division on April 30, 1971, that being the District in which the defendant Schneider and the Water Quality Office were located. The case was then promptly transferred to this District without further action being taken in Illinois.

In its complaint as originally filed, Shaw-Henderson, Inc. invoked as alleged jurisdiction of the subject matter and the parties hereto the provisions of Title 28 U.S.C.A. Section 1361 and 1391(e). Because of the pressing nature of the matter, (see affidavit of Robert R. Courchaine, Exhibit R, Exhibits J and K, and page 17 of the transcript of proceedings in this court on May 14, 1971) the court upon receipt of the file thus transferred, immediately contacted counsel for the parties and requested a meeting in Grand Rapids to be held on May 14, 1971 to consider the question of issuance of a temporary restraining order and of a preliminary injunction, the motions for which were filed with the original complaint.

At the May 14 hearing, counsel for plaintiff, for defendants Schneider and Federal Water Quality Administration and for defendant City of Charlevoix were present. After an extended conference between the parties and the court, a stipulation was reached whereby after waiving the necessity of pretrial and making answer by the defendants, it was agreed that the matter might be set down for hearing on May 26 in this court pursuant to a stipulation entered into and exhibits agreed to be received as more fully set forth in the transcript

on the record on May 14. It was agreed in substance that without prejudice to the rights of the defendants to be heard upon their respective motions to dismiss for lack of jurisdiction of the subject matter, the court might, insofar as possible, endeavor to resolve all issues in the law suit, since there was little dispute as to the facts. The parties were left free to introduce into evidence on May 26 such additional proofs as might bear upon the case.

On May 26 plaintiff without objection filed its amended complaint, claiming to invoke the jurisdiction of the court under the provisions of Title 28 U.S.C.A. § 1361 and § 1391(e); Title 5 U.S.C.A. Section 702; Title 33 U.S.C.A. Section 466g–1; and Title 42 U.S.C.A. Section 1983. Plaintiff in its amended complaint seeks the following relief:

"A. That a preliminary and/or permanent injunction issue forthwith, without notice and without being required on the part of the plaintiff, prohibiting and enjoining defendant PROGRAM DIRECTOR, from allocating or disbursing, in whole or in part, any funds to the CITY OF CHARLEVOIX, MICHIGAN, and that defendant CITY OF CHARLEVOIX, MICHIGAN, be enjoined and prohibited from executing said contract between the CITY OF CHARLEVOIX, MICHIGAN and the said Clark Construction Company, and from performing any of the terms of said contract.

"B. That the Court issue a declaratory judgment against defendant CITY OF CHARLEVOIX, MICHIGAN setting aside the award of the said contract to Clark Construction Company, and declaring said contract null and void;

"C. That the Court issue a declaratory judgment that plaintiff, SHAW-HENDERSON, INC. is the lowest responsible bidder;

"D. That the Court issue a declaratory judgment that defendant CITY OF CHARLEVOIX, MICHIGAN award said contract to plaintiff, SHAW-HENDERSON, INC.;

"E. That plaintiff be awarded the approximate sum of $25,000.00, as shown and proved by the evidence herein, for the costs incurred in submitting its written bid to the CITY OF CHARLEVOIX, MICHIGAN, at the latter's invitation and solicitation, in respect to said contract.

"F. That plaintiff may have such other and further relief as this Court deems proper or as equity may require."

At the hearing on May 26 further stipulations were placed upon the record and exhibits received in evidence and following the arguments of counsel, the court took all matters under advisement.

## I.

## SUBJECT MATTER JURISDICTION

Plaintiff's amended complaint predicates subject matter jurisdiction on 28 U.S.C.A. §§ 1361, 1391; 33 U.S.C.A. § 466g–1; 42 U.S.C.A. § 1983; and 5 U.S.C.A. § 702. Defendants Schneider and the City of Charlevoix move to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule 12(b) (1).

This court need not discuss the applicability of all of the above cited statutory provisions as they may relate to this case, for the court finds that 5 U.S.C.A. § 701 et seq. allows review of the subject matter of plaintiff's complaint, as it relates to defendant Schneider.

The Federal Water Quality Administration of which defendant Schneider is Regional Program Director, is an agency under the Department of Interior. The responsibilities of the Administration are set forth generally in 33 U.S.C.A. §§ 1151–1175. For the purposes of this opinion these Sections will be known as

the Water Control Act (WCA). Section 1151 of the WCA sets forth the policy and purpose of the administration.

"(a) The purpose of this chapter is to enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution.

"(b) In connection with the exercise of jurisdiction over the waterways of the Nation and in consequence of the benefits resulting to the public health and welfare by the prevention and control of water pollution, it is declared to be the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of the States in preventing and controlling water pollution, to support and aid technical research relating to the prevention and control of water pollution, and to provide Federal technical services and financial aid to State and interstate agencies and to municipalities in connection with the prevention and control of water pollution. The Secretary of the Interior (hereinafter in this chapter called 'Secretary') shall administer this chapter through the Administration created by section 1152 of this title, and shall supervise and direct the head of such Administration in administering this chapter."

Section 1152 of the WCA which establishes the Administration, states in part:

"There is within the Department of the Interior a Federal Water Quality Administration (hereinafter in this chapter referred to as the 'Administration'). The head of the Administration shall be appointed, and his compensation fixed, by the Secretary. The head of the Administration may, in addition to regular staff of the Administration, which shall be initially provided from the personnel of the Department, obtain, from within the Department or otherwise as authorized by law, such professional, technical, and clerical assistance as may be necessary to discharge the Administra-

tion's functions and may for that purpose use funds available for carrying out such functions; and he may delegate any of his functions to, or otherwise authorize their performance by, any officer or employee of, or assigned or detailed to the Administration."

The specific section with which this case deals is Section 1158 of the WCA, authorizing grants for construction of sewage treatment works. The section states in part:

"(a) The Secretary is authorized to make grants to any State, municipality, or intermunicipal or interstate agency for the construction of necessary treatment works to prevent the discharge of untreated or inadequately treated sewage or other waste into any waters and for the purpose of reports, plans, and specifications in connection therewith.

"(b) Federal grants under this section shall be subject to the following limitations: (1) No grant shall be made for any project pursuant to this section unless such project shall have been approved by the appropriate State water pollution control agency or agencies and by the Secretary and unless such project is included in a comprehensive program developed pursuant to this chapter; (2) no grant shall be made for any project in an amount exceeding 30 per centum of the estimated reasonable cost thereof as determined by the Secretary; (3) no grant shall be made unless the grantee agrees to pay the remaining cost; (4) no grant shall be made for any project under this section until the applicant has made provision satisfactory to the Secretary for assuring proper and efficient operation and maintenance of the treatment works after completion of the construction thereof; and (5) no grant shall be made for any project under this section unless such project is in conformity with the State water pollution control plan submitted pursuant to the provisions of section 1157 of this title and has been certified by the appro-

priate State water pollution control agency as entitled to priority over other eligible projects on the basis of financial as well as water pollution control needs; (6) the percentage limitation of 30 per centum imposed by clause (2) of this subsection shall be increased to a maximum of 40 per centum in the case of grants made under this section from funds allocated for a fiscal year to a State under subsection (c) of this section if the State agrees to pay not less than 30 per centum of the estimated reasonable cost (as determined by the Secretary) of all projects for which Federal grants are to be made under this section from such allocation."

The plaintiff contends that the Administration's grant made pursuant to the above applicable sections is reviewable under 5 U.S.C.A. § 701 et seq. commonly known as the Administration Procedure Act. Section 702 of APA states in part:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

The defendants' main objection to plaintiff's reliance upon the APA as grounds for jurisdiction over the subject matter is that the agency action as stipulated to and evidenced by the Offer and Acceptance (Exhibit B), is unreviewable because such action is purely discretionary under the applicable sections of the Water Control Act.

The defendants point out that Section 701 of APA prohibits judicial review of agency action which that statute describes as such "agency action (which) is committed to agency discretion by law".

The issue is therefore whether the federal grant in sewage treatment works given to the City pursuant to 33 U.S.C.A. § 1151 et seq is such "agency action * * * committed to agency discretion by law".

Defendants relie upon Knight Newspapers, Inc. v. United States, 395 F.2d 353 (6 Cir., 1968) in support of their stand. In that case the Sixth Circuit Court of Appeals refused to review the action taken by the Postmaster General in denying Knight a postage refund. There the court said at page 357:

"Section 4055 provides that the Postmaster-General 'may' grant a refund only after it is shown to the satisfaction of the Postmaster-General that a refund is justified. The express language of the statute indicates that this decision is committed to the discretion of the Postmaster-General. Since the Administrative Procedure Act, 5 U.S.C. § 701(a) prohibits judicial review of agency action 'committed to agency discretion by law,' we are without power to review the Postmaster-General's decision denying a postage refund."

However, the court went on to say:

"It is well settled that the mere fact that all agency action involves some degree of discretion of judgment does not render every agency action unreviewable under the provisions of the Administrative Procedure Act prohibiting judicial review of agency action by law committed to agency discretion. A court may not review a decision committed to the discretion of an agency pursuant to a permissive type statute, but may do so where the decision was made pursuant to a mandatory type statute, even though the latter decision involves some degree of discretion. Ferry v. Udall, 336 F.2d 706 (C.A.9, 1964) cert. denied 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965)."

In *Ferry,* supra, the 9th Circuit Court of Appeals held that the Secretary of Interior's Action was "committed" to his discretion and therefore unreviewable. There the court said at page 711:

"We recognize the intrinsic difficulty in determining whether a discretionary action of an agency is reviewable. Almost every agency action in-

volves some degree of discretion of judgment. Yet it cannot be said that, for this reason, every agency action is unreviewable. Homovich v. Chapman, 89 U.S.App.D.C. 150, 153, 191 F.2d 761, 764. The analytical problem is that of determining when the agency action is 'committed to agency discretion' within the meaning of section 10 of the Administrative Procedure Act, and when it merely 'involves' discretion which is nevertheless reviewable. 4 Davis, Administrative Law Treatise § 28.16, pp. 80–81; Anno., Administrative Procedure Act, 97 L. Ed. 884, 889."

■ However, in analyzing the Federal Water Quality Administration's action here pursuant to 33 U.S.C.A. § 1158, although the Secretary's action is discretionary to a certain extent, there are prerequisites or limitations set up under § 1158(b) which must be met before a federal grant will be allowed. Therefore, it cannot be said that the agency action is "committed to agency discretion" as in *Knight* and *Ferry*. Accordingly, therefore, this court is of the opinion that authorization of Federal grants in accordance with § 1158 is reviewable by the court, such review being limited, however, to that allowed by Section 706 of the Administrative Procedure Act.

## II.

## STANDING TO SUE

Another issue which has been raised by the defendants which should be discussed before this court rules on the merits of plaintiff's claim against defendant Schneider, is that plaintiff lacks standing to sue in this instance. To this objection, plaintiff submits that Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970), Superior Oil Company v. Udall, 133 U.S. App.D.C. 198, 409 F.2d 1115 (1969) and Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970), give him standing. In all three of the above cases, the government agency was the party seeking the bids on certain projects. In those cases plaintiff bidders disputed the award of the project to other bidders, basing their claims upon the bidding irregularity procedures of the governmental agencies contrary to the procedures set up in the Code of Federal Regulations. The courts found that plaintiffs had standing to challenge the agency action. In *Scanwell*, the court reviewed extensively the issue of standing in light of the Administrative Procedure Act, and the court concluded plaintiff had standing to challenge the governmental action, stating at 873:

"In reaching the correct analysis of the threshold question of standing the court must look not to the merits of the petitioner's case but rather to his status."

■ The holdings of the above three cases, however, are not at issue here. The facts of the instant case show that the Federal Water Quality Administration was not the party seeking bids for the sewage project. The federal grant was made available to the City pursuant to Sections 1151 et seq., more specifically Section 1158 of WCA. Plaintiff's injury derives from allegedly unlawful conduct of the City in refusing to award it the bid. The FWQA in no way is charged with the responsibility of determining who is the lowest responsible bidder. It is simply one of several sources of revenue, without which the City would merely then be obligated to look elsewhere to finance its project. The City is not challenging the propriety of the Federal grant. Plaintiff is not suing to redress a public wrong. It is suing in its own interest. It is, therefore, this court's opinion that the plaintiff has not the necessary status or proper interest by which to challenge the Federal Water Quality Administration's action.

The *Scanwell* case points out the difficulty that courts have had in dealing with the issue of standing. Circuit Judge Edward A. Tamm, in writing the opinion in the court, stated at page 861:

"Standing has been called one of the most amorphous concepts in the entire domain of the public law. That this

statement is undoubtedly true is evidenced by the mental gymnastics through which the courts have passed in determining standing issues. Professor Davis describes the circuity of reasoning which surrounds these issues as follows:

" 'A plaintiff who seeks to challenge governmental action always has standing if a legal right of the plaintiff is at stake. When a legal right of the plaintiff is not at stake, a plaintiff sometimes has standing and sometimes lacks standing. Circular reasoning is very common, for one of the questions asked in order to determine whether a plaintiff has standing is whether the plaintiff has a legal right, but the question whether the plaintiff has a legal right is the final conclusion, for if the plaintiff has standing his interest is a legally-protected interest, and that is what is meant by a legal right.'

"The law of standing as developed by the Supreme Court has become an area of incredible complexity. Much that the Court has written appears to have been designed to supply retrospective satisfaction rather than future guidance. The Court has itself characterized its law of standing as a 'complicated specialty of federal jurisdiction.' United States ex rel. Chapman v. FPC, 345 U.S. 153, 156, 73 S.Ct. 609, 97 L.Ed. 918 (1953)."

This court thus determines that the plaintiff has no standing to challenge the action of defendant Schneider, and therefore, this action should be dismissed as against Schneider in accordance with Federal Rule 12(b) (6).[1]

■ If, however, this court were to hold that plaintiff has standing and, therefore, the court could pass upon the merits of the claim, plaintiff fares no better.

### III.

### SCOPE OF REVIEW

■ Therefore, turning to the merits of plaintiff's claim against defendant Schneider, it is observed that 5 U.S.C.A. § 706 (Administrative Procedure Act) sets out the scope of judicial review of an agency's action. It states in part:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

---

1. The Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969) has clarified the problem at least to some extent, holding that the plaintiff has standing if (1) the challenged action has caused him injury in fact, economic or otherwise, and (2) the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

At the outset, there is a serious question whether plaintiff meets the first test for its claim of injury in fact relates not to the action of the defendant Schneider, but rather that of the defendant City of Charlevoix. Assuming, however, that Shaw-Henderson does meet the first test, it must fail the second. Plaintiff has shown the court no provision in the Federal Water Pollution Control Act which places it even arguably within the zone of interests to be protected or regulated. On the contrary, Section 1151 of the Act, in recognizing "the primary responsibilities and rights of the States in preventing and controlling water pollution" and in setting forth the other policies of Congress, would appear rather clearly to exclude this particular claim from the zone of interests intended to be protected by the Act, and to have left that protection, if it exists at all, to the States.

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or, immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393."

After review of 33 U.S.C.A. § 1158 (b), containing the limitations which are placed upon the secretary's authorization of grants in sewage treatment works, the court finds no evidence in this case to support a finding that these requirements were not followed. Indeed, the plaintiff does not allege that these regulations were violated.

The gravamen of plaintiff's complaint against Schneider deals with the Offer and Acceptance, specifically paragraph A of Section II—Assurances. It states in part:

"A. That actual construction work will be performed by the lump sum (fixed price) or unit price contract method, that adequate methods of obtaining competitive bidding will be employed prior to awarding the construction contract, and that the award of the contract will be made to the responsible bidder submitting the lowest acceptable bid."

It is plaintiff's contention that Schneider had an independent duty to make sure that all the assurances delineated in Section II were performed in fact by the City, especially when it was brought to the attention of the defendant that there was allegedly non-performance by the City. However, upon reading the Offer and Acceptance in its entirety, it is clear that no such prerequisite has been placed upon Schneider. He received the numerated assurances from the City, through its representative, Mayor William Fochtown, when the Mayor signed the Acceptance on September 5, 1970. Over the Mayor's signature appeared the following language:

"I, the undersigned, being duly authorized to take such action, as evidenced by the attached CERTIFIED COPY OF AUTHORIZATION BY THE APPLICANT'S GOVERNING BODY, do hereby accept this offer and make the assurances contained herein."

■ To require that the Federal Water Qualities Administration be a policing and enforcement agency in the absence of legislation is not the proper role of this court and to compel such would unduly burden the federal government and create substantial friction in an area already fraught with disharmony. The plaintiff contends, however, that an affirmative duty is placed upon the defendant Schneider by 41 CFR § 1–2.301 (a) (1969), which provides:

"To be considered for award, a bid must comply in all material respects with the invitation in bids so that, both as to the method and timeliness of submission and as to the substance of any resulting contract, all bidders may stand on an equal footing and the integrity of the formal advertising system may be maintained."

and 41 CFR § 1–2.404–2(a) (1969) which provides:

"Any bid which fails to conform to the essential requirements of the invitation in bids, such as specifications, delivery schedule or permissible alter-

nates thereto, shall be rejected as nonresponsive."

▋ However, these provisions are not applicable here since they apply to cases where a governmental agency is the procuring party. These regulations do not apply where, as here, the agency is the disbursing unit of federal grants on a state project only. Even though Schneider's responsibilities were governed by those delineated in 33 U.S.C.A. § 1151 et seq., he nevertheless received the legal opinion of the City Attorney, Mr. Michael, (Exhibit E) on the issue of bidding procedures. Furthermore, he considered Mr. Holland's letters rebutting the accusation by Mr. Shaw that the City acted improperly.

In his April 29 letter, Exhibit D, 1 and 2, to Mr. Kuebler, Mr. Schneider stated:

"In addition, based on a thorough review of all of the information pertaining to the City's proposed award of Contract 70–S–2(R), Division A, including the April 2, 1971 letters from Mr. Holland, your consulting engineer, and Mr. Michael, your City Attorney, we hereby concur in the City awarding this contract to Clark Construction Company in the eligible amount of $1,190,245. It should be clearly understood that our concurrence in the City's awarding this contract is based on the April 29, 1971 legal opinion prepared by Mr. Michael."

It is, therefore, this court's opinion, after reviewing all the evidence that defendant Schneider neither acted arbitrarily, capriciously, or abused his discretion nor acted contrary to or in excess of the statutory authority vested in him as program director.

## IV.

### PENDENT JURISDICTION

The next issue which must be resolved is whether the nature of the claims asserted allows this court to exercise its pendent jurisdiction to hear the state claim against the City of Charlevoix. No diversity jurisdiction exists between the City and plaintiff Shaw-Henderson and, therefore, if this court hears the state claim, it must do so on the strength and nature of the federal claim asserted. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965). In *Gibbs* the Supreme Court stated at page 725, 86 S.Ct. at page 1138:

"Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *,' U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103 [53 S.Ct. 549, 77 L.Ed. 1062]. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole."

The Supreme Court agreed in result with the appellate court on the pendent jurisdiction issue, but nevertheless the court reviewed the substance of the doctrine in light of the liberal view of the pleading now found in the Federal Rules of Civil Procedure, and found that the test which the 6th Circuit Court of Appeals applied in the case was a "limited approach [which] is unnecessarily grudging."

The Court of Appeals for the 6th Circuit in its opinion in *Gibbs,* 343 F.2d 609 (1965) had sustained the common law remedy, even though the federal claim was dismissed by the trial judge after a jury verdict on the federal claims. The court relied upon Hurn v. Oursler,

289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, Siler v. Louisville & N. R. R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753, in upholding the pendent jurisdiction:

"Our present application of the doctrine of pendent jurisdiction is not novel. In Hurn v. Oursler, Mr. Justice Sutherland quoted from Siler v. Louisville & N. R. R. Co., 213 U.S. 175, 191, 29 S.Ct. 451, 455, 53 L.Ed. 753, 757 (1909), where the Court ruled that once federal question jurisdiction had been acquired the circuit court 'had the right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or *even if it omitted to decide them at all, but decided the case on local or state questions only.'* (Emphasis supplied.) UMW v. Meadow Creek Coal Co., 263 F.2d 52 (CA 6, 1959), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959) applied this theory in a case where, as here, the same conduct was claimed to constitute both a secondary boycott and a conspiracy prohibited by Tennessee common law. There the UMW argued that 'the trial court, having in effect held that there was no violation of the federal Act, had no jurisdiction to determine and decide the common law or non-federal cause of action.' 263 F.2d 59. We upheld federal jurisdiction to grant relief under state law, however, observing that 'the claim of secondary boycott and unlawful conspiracy are not separate causes of action, but merely different grounds to support a single cause of action.' 263 F.2d 60. We have continued to apply the rule of pendent jurisdiction, most recently in Price v. UMW, 336 F.2d 771, 775 (CA 6, 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965), and we are pointed to no persuasive reason for refusing to apply it here." Gibbs, 343 F.2d 609 at 615.

In a later case Lewis v. Pennington, 400 F.2d 806 (6 Cir., 1968) the 6th Circuit followed the guidelines laid down by the Supreme Court in *Gibbs*. In *Lewis*, judgment was entered against the United Mine Workers in accordance with Tennessee law, but the cause of action alleging a violation of the Sherman Anti-Trust Act was dismissed as against UMW. The court said at page 815:

" * * * Pendent jurisdiction was also found to exist in United Mine Workers of America v. Gibbs (citation omitted). Therein the Supreme Court stated two of the requirements for the exercise of pendent jurisdiction to be (1) that the federal claim have 'substance' so as to confer jurisdiction of the subject matter on the court in which the action is commenced and (2) that the 'state and federal claims must derive from a common nucleus of operative fact' ".

As to the second requirement, the Court of Appeals in *Lewis* observed that it could not be said that the state and federal claims did not "derive from a common nucleus of operative fact" especially in light of the appellate court's understanding of that requirement. At page 816, the court stated:

"The UMW concedes, in spite of the District Court's ultimate dismissal of Dean's and Parton's federal claims, that those claims were 'substantial' within the meaning of Gibbs. It strenuously challenges the existence of a 'common nucleus of operative facts,' arguing that the Sherman Act claim 'embraces so many allegations irrelevant in time and content to the state claim, that to find there is a "common nucleus of operative fact" is to destroy the practical significance of this requirement'. *However, it cannot be denied that there is at the very least a significant overlapping of the facts alleged and proved under the Sherman Act and state law claims,* and it cannot be said that the District Court's resolution of this issue in favor of jurisdiction was a clearly erroneous abuse of discretion."

■ As the above mentioned quote points out, the requirement of "substantiality" of the federal claim as laid down

by the Supreme Court in *Gibbs* was not in issue. Upon reading the Supreme Court decision in *Gibbs,* it is apparent that the requirement that there be "substantiality of federal issues" which gives the court the "power in federal courts to hear the whole" case, is different than that "substantiality" as it relates to whether the court should exercise its pendent power and hear the case. For a finding that the federal issues are substantial in accordance with Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, as the Supreme Court cites, does not necessarily admit to a finding of substantiality necessary to exercise its pendent jurisdiction.

In Levering the Supreme Court said at page 105, 53 S.Ct. at page 550:

"The question of jurisdiction as thus limited is to be determined by the allegations of the bill, and not upon the facts as they may turn out, or by a decision of the merits. Mosher v. Phoenix, 287 U.S. 29, 30 [53 S.Ct. 67, 77 L.Ed. 148], and cases cited. Whether an objection that a bill or a complaint fails to state a case under a federal statute raises a question of jurisdiction or of merits is to be determined by the application of a well settled rule. If the bill or the complaint sets forth a substantial claim, a case is presented within the federal jurisdiction, however the court, upon consideration, may decide as to the legal sufficiency of the facts alleged to support the claim. But jurisdiction, as distinguished from merits, is wanting where the claim set forth in the pleading is *plainly unsubstantial.* The cases have stated the rule in a variety of ways, but all to that effect. See for example, Mosher v. Phoenix, supra; Hull v. Burr, 234 U.S. 712, 720 [34 S.Ct. 892, 58 L.Ed. 1557]. (Other citations omitted.) And the federal question averred may be plainly unsubstantial either because obviously without merit, or 'because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.'"

This court is satisfied that the requirements of "substantiality of federal issues" has been met in this case in accordance with the *Levering* holding. However, the determination that, therefore, this court may hear the whole case does not mean that the court should do so. On this point the Supreme Court said in *Gibbs* at pages 726–727, 86 S.Ct. at page 1139:

"That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, Erie R. Co. v. Tompkins, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188]. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. In the present case, for example, the allowable scope of the state claim implicates the federal doctrine of pre-emption; while this interrelationship does not create statutory

federal question jurisdiction, Louisville & N. R. Co. v. Mottley, 211 U.S. 149 [29 S.Ct. 42, 53 L.Ed. 126], its existence is relevant to the exercise of discretion. Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed.Rule Civ.Proc. 42 (b). If so, jurisdiction should ordinarily be refused.

The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed."

With the above guidelines in mind, this court is of the opinion that the claim against the City of Charlevoix should be dismissed. In making this determination this court finds, among other things, that the federal participation in this project is minimal (Exhibit B shows that the U. S. grant was $64,250 on a project estimated to be in excess of $1,295,000); that the City of Charlevoix was "compelled" to proceed forward irrespective of where the funds came from; that the State issues substantially predominate in this case, and that the evidence and the exhibits and remedies sought involve strictly state matters.

## V.

## MERITS OF CLAIM AGAINST CITY OF CHARLEVOIX

While, as pointed out above, this court finds, after reviewing the evidence, that the claim against the government should be dismissed upon the merits and furthermore, that the claim against the City of Charlevoix should be dismissed without prejudice upon defendants' motions, nevertheless, the court heard the entire matter, motions included, at one time. Accordingly, the court reviewed the merits of plaintiff's claim against the City of Charlevoix and reached certain findings of fact and conclusions with respect thereto. Thus, these findings have bearing on the ultimate outcome of the case if it is found that this court had the power to make such findings.

The heart of the plaintiff's complaint is that the irregularities referred to in the Clark bid were so gross that the acceptance of that bid would constitute not only arbitrary and capricious conduct of the City, but also constitute such on the part of defendant Schneider. Plaintiff strongly argues that the immediate effort to withdraw the name of Axtel-Hardy as a subcontractor after the contract bid was opened and the complete failure to name any subcontractor whatsoever for the pipe work at item 16 (Exhibit F), constituted, in fact, what is called "bid peddling". In other words, plaintiff claims that by this means, Clark was able to submit a lower bid than was otherwise possible, and thereafter could shop around for subcontractors at a lower figure, thus placing him in a superior competitive position as to the other bidders, and destroying the competitive nature of the bidding procedure.

As to the bid of Axtel-Hardy as subcontractor, there is no evidence that Clark was in any way involved in any computation error of the subcontractor. The proposal did in fact list Axtel-Hardy

as a subcontractor under item 36 of the proposal and Axtel-Hardy had in fact submitted its bid on the subcontract to Clark, albeit erroneously. Presumably Axtel-Hardy could have been held to that bid by Clark as much as could any other subcontractor named by any other bidding contractor.

With respect to the failure of Clark to list any subcontractor whatsoever in the pipe work appearing as item 16 in its bid, this is completely true and could have perhaps warranted the rejection of the Clark bid by the City, had it so desired. However, an examination of the other bids reveals that at least two other bidders failed as well to list certain of the subcontractors as requested.

It is further to be seen from all of the bids submitted that the amount of the bid on the pipe work by Clark was $160,-000 or almost $53,000 more than the amount set forth by Shaw-Henderson.

Mr. Holland noted this disparity (Exhibits N & S), but, however, observed that Clark's bid included a "very low cost for plumbing," $26,000. Whereas the second bidder, Shaw-Henderson, had a bid in plumbing of $140,193.00 and the third bidder a plumbing bid for $140,196. Holland concluded that "it appeared to us at the time that the low bidder had unbalanced his bid with a high price in pipe work and a low price in plumbing." He further stated in his affidavit (Exhibit S) that the "irregularities raised by Mr. Shaw in the Clark Construction Company bid proposal were not substantial irregularities." In light of Mr. Holland's qualifications as consulting engineer on this job and further in light of the fact that he did consider all the objections made by Shaw-Henderson, this court is unable to say that Mr. Holland's conclusions were unwarranted.

Furthermore, final disposition and acceptance of the bids was vested in the City. It had the discretion to waive the irregularities and accept the bids as given. This it did after receiving and reviewing the evidence. This court is unable to say that it abused this discretion when it waived the irregularities.

No allegations are made that the nature of its bid by Clark would enable it to successfully obtain the contract on the basis that it could avoid conforming to the specifications for work as set forth in the proposed contract. So far as the court can ascertain, the entire difficulty encountered and all of the charges made by Shaw-Henderson were examined and placed before the City of Charlevoix for its consideration. The Director of the Federal agency, Mr. Schneider, was apprised and the president of the plaintiff Shaw-Henderson was given a full opportunity to make his arguments before the City Council. While the difference in total bid is narrow indeed, still the total amount of the Clark bid is in fact lower than that of Shaw-Henderson. It has not seriously been claimed by anyone that Clark desired to or could in any way legally avoid its obligation to do the work specified for the total amount of its bid. Nowhere has it been shown to the court that even if there were "job peddling", such would as a matter of law invalidate the bid. Presumably the City might have omitted the requirement of naming subcontractors altogether and then made an investigation of those proposed to be used after opening the bids and in the course of determining the competence of the successful bidder. If the practice can be a pernicious one, the court is unable to find even a suggestion of evil design in the facts here. Counsel for plaintiff attached to their brief a copy of proposed legislation before the Congress, H.R. 10, 92nd Congress, First Session (Plaintiff's Exhibit 3) which if enacted would presumably require that in contracts with any military or non-military department, independent establishment of the executive branch of the government, or any wholly owned government corporation for construction for a new building in the United States which is estimated to cost in excess of $100,-000, all subcontractors must be named and any substitutions for those named may be authorized only under compelling circumstances as listed in the act. With-

out endeavoring to decide whether that proposed bill would, if enacted, affect this case, and without pretending to decide whether such legislation should in fact be passed into law, the simple fact is that the bill is not shown to be law now. The very fact of its introduction would indicate that the requirement of naming subcontractors is not now part of the federal law.

■ Finally, the court is of the opinion that even were it to be held that the record in this case presents a substantial variation affecting the amount of bid which gave to Clark an advantage or benefit now allowed to other bidders and was in fact an element in fixing the price (which this court does not) still the court is of the opinion that it could not grant relief to the plaintiff which would in effect order the awarding of the contract to Shaw-Henderson for the following reasons:

A. It is true that the consulting engineer in his letter of February 25, Exhibit I, found on page 4 thereof both Clark and Shaw-Henderson had a satisfactory financial statement, equipment, and experience. Under the proposal, however, the final decision would necessarily be that of the City. Mr. Holland's capacity is limited to that of consultation and advisement. Page IB–1 of Exhibit A provides:

"It is the intention of the owner to award this contract to a bidder competent to perform and complete all work in a satisfactory manner".

Thus, although Holland's opinion is persuasive, in the final analysis the decision would be up to the City to determine that Shaw-Henderson met that standard before it would be awarded a contract in substitution for Clark.

B. While emphasis in the trial of this case lay primarily upon the Clark bid and its claimed inadequacy, there are at least some irregularities in the bid of Shaw-Henderson itself. The minor discrepancy of $10 between the total bid of Shaw-Henderson and the sum of the items making it up would undoubtedly be de minimis. But see the condition attached to plaintiff's bid on Division B (see Exhibit E, P–5) providing that: "We will accept Division B only if we are low bidder on Division A." At Page IB–4 of Exhibit A, the City reserves the right to reject the proposal on account of interlineations as well as alterations and erasures. Section IB–5 provides that:

"Supplemental statements by the bidder written into the proposal form or by letter modifying the terms of the proposal will be considered as irregular and will make the proposal subject to rejection".

C. The record does not reflect whether or not the competence of the subcontractors listed by plaintiff in its bid has been passed upon by the City in determining whether, through them, plaintiff would be "competent to perform all work in a satisfactory manner". In essence, the same argument made by plaintiff as to Clark's failure to name a subcontractor could apply to plaintiff itself if one of its subcontractors were determined to be unreliable. The question has not been passed upon by this court nor raised, but certainly the consideration of it could be had by the City before the bid was accepted and the contract awarded.

D. It would appear to the court that, even assuming that the Clark bid were fatally defective, there would still remain the question of whether or not the Shaw-Henderson bid should be, therefore, accepted or rejected, or perhaps whether the entire matter should again be resubmitted after rejection of all bids, as done before. These matters are all so inherently discretionary that it would ap-

pear to the court that in any event the final decision should repose in the City. In other words under the facts and circumstances in this case, assuming the Clark bid were held invalid, the very most a court could or should do upon determining the Clark bid to be void would be to remand the matter to the City for its further action.

E. And lastly, Shaw-Henderson, as the unsuccessful bidder does not have standing under Michigan law to bring this private action against the City of Charlevoix. Malan Construction Corp. v. Board of County Road Comm., 187 F.Supp. 937 (E.D.Mich.1960) and Michigan court case decisions cited therein.

Therefore, and in accordance with the above opinion, an order shall be entered dismissing plaintiff's claim with prejudice as to defendant Schneider and dismissing plaintiff's claim against the City of Charlevoix, but however, this latter dismissal shall be without prejudice.